**HAGEMEYER NORTH AMERICA, INC., n/k/a Hagemeyer (N.A.) Holdings, Inc., Plaintiff,**

v.

**GATEWAY DATA SCIENCES CORPORATION a/k/a Brownshire Holdings, Inc., Defendant.**

**Gateway Data Sciences Corporation a/k/a Brownshire Holdings, Inc., Counterclaimant,**

v.

**Hagemeyer North America, Inc., n/k/a Hagemeyer (N.A.) Holdings, Inc., Counterdefendant.**

No. 97–C–635.

United States District Court, E.D. Wisconsin.

Aug. 12, 2004.

**596**

Catrina Celeste Creswell, David Pernini, Michael S. French, Wargo & French LLP, Atlanta, GA, Charles P. Graupner, Michael, Best & Friedrich, Waukesha, WI, for Plaintiffs.

David A. Van Engelhoven, The Cavanagh Law Firm, Phoenix, AZ, Mark E. Rudolph, Scottsdale, AZ, for Defendants.

## DECISION AND ORDER

RANDA, Chief Judge.

This matter comes before the Court on a motion to compel discovery (Docket # 79). The plaintiff, Hagemeyer North America, Inc. n/k/a Hagemeyer N.A. Holdings, Inc. ("Hagemeyer") seeks to compel production of e-mails, financial statements, employee billing statements, computer backup tapes, and other documents from the defendant, Gateway Data Sciences, also known as Brownshire Holdings, Inc. ("Gateway").

In its Memorandum in Support of Plaintiff's Motion to Compel, Hagemeyer states that Gateway has a duty to segregate the material requested from non-responsive documents. It also asks the Court to order Gateway to conduct an electronic search of computer backup tapes for e-mails at its own cost.

## I. BACKGROUND

This case was filed on May 30, 1997, and Hagemeyer served Gateway with its first set of document requests on October 17, 1997.

Gateway responded on December 8, 1997. Gateway objected to 20 out of the 22 document requests but, nonetheless, produced over 10,000 pages of responsive documents. Many of the objections were boilerplate, but a handful of the objections based on overbreadth were made in good faith.

Gateway filed bankruptcy in February 1998, and the present proceedings were stayed. Declaration of Michael M. Gordon Re: Plaintiff's 10/29/03 Motion to Compel Discovery ("Gordon Decl.") ¶ 2; Declaration of Mark E. Rudolph Re: Plaintiff's 10/29/03 Motion to Compel Discovery ("Rudolph Decl.") ¶ 3; Declaration of Michael S. French in Support of Plaintiff's Motion to Compel ("French Decl.") ¶ 7. While the present action was stayed, the bankruptcy trustee ("trustee") allowed Hagemeyer unfettered access to Gateway's records and documents, which were kept at the time in two storage facilities, one in Phoenix, Arizona and one in Tucson, Arizona. French Decl. ¶ 8.[1]

Gateway emerged from bankruptcy in December 2002. Gordon Decl. ¶ 2. Hagemeyer served Gateway with another set of document requests on July 30, 2003. Gateway responded to the requests on September 8, 2003, objecting that, *inter alia,* all responsive documents had already been produced in these proceedings. French Decl., Exh. B.[2] A little over a week later, Michael French ("French"), counsel for Hagemeyer, sent a letter to Mark Rudolph ("Rudolph"), Gateway's attorney, detailing deficiencies in Gateway's responses.

During a break in a deposition in October 2003, French conferred with Rudolph attempting to resolve the discovery dispute. Rudolph Decl. ¶ 7; French Decl. ¶ 5. Rudolph offered to allow Hagemeyer's attorneys to inspect the contents of the Phoenix storage facility, but French refused. Gordon Decl. ¶ 15; Rudolph Decl. ¶ 7; Second Declaration of Michael S. French in Support of

---

1. The materials held by the trustee in Tucson have since been placed in an office in Phoenix. The materials kept in the storage facility in Phoenix have not been moved. Gordon Decl. ¶ 5.

2. Gateway, in its responses to Requests Nos. 6–7 & 13, states that all responsive documents had been produced to Hagemeyer in the bankruptcy proceedings. Requests Nos. 6–7 & 13 seek documents relating to the attorneys' fees, litigation costs, and the expected judgment stemming from this action.

Plaintiff's Motion to Compel ("French 2d Decl.") ¶ 6. There is no evidence in the record to suggest that Hagemeyer has ever been denied access to Gateway's storage facilities. *See* Gordon Decl. ¶¶ 4, 8, 13 & 15; Rudolph Decl. ¶¶ 4 & 7; French Decl. ¶¶ 8–9.

Hagemeyer filed the motion to compel considered herein on October 30, 2003. French filed a sworn declaration in support of the motion. Rudolph and Michael Gordon ("Gordon"), the former President and C.E.O. of Gateway, filed sworn declarations on Gateway's behalf. On December 10, 2003, French again wrote Gateway's attorneys calling into question a comment in Gordon's declaration in which he claimed that Hagemeyer had previously received the computer backup tapes from the trustee. French 2d Decl., Exh. C.[3]

While the preceding is not in dispute, the parties provide vastly differing accounts of the following. Gateway objected to each of Hagemeyer's document requests. Much of the parties' epistolary dispute, however, focused on Gateway's computer backup tapes, which Hagemeyer believes contain relevant e-mails, and on whether Gateway's documents were kept in the ordinary course of business. *See* French Decl., Exh. C; French 2d Decl., Exh. B.

Hagemeyer claims that the documents in the storage facility were not kept in the ordinary course of business but were buried amongst large amounts of non-responsive documents. In support of Hagemeyer's charge, French states that the documents he found at the storage facility "were preserved in a highly disorganized manner." French Decl. ¶ 9. Gateway, for its part, claims that the documents are organized and clearly labeled. Rudolph Decl. ¶ 5; Gordon Decl. ¶ 6.[4] Gordon states that, when he perceived boxes in poor condition, he repackaged the contents and copied the labels. Gordon Decl. ¶ 7. Furthermore, according to Gordon and Rudolph, the materials kept at the storage facility in Phoenix have remained there continuously since the trustee placed them there in June 1998—save for approximately 15 boxes which were moved to the Phoenix office. Gordon Decl. ¶¶ 3 & 6; Rudolph Decl. ¶ 5.

Turning to the computer backup tapes, Hagemeyer claims that they include a "full backup of Gateway's e-mails." French Decl. ¶ 11. Hagemeyer maintains that the existence of these tapes is established by the Rule 2004 Examination of "Michael A. Gordon" and Vickie B. Jarvis ("Rule 2004 Examination") conducted as part of the bankruptcy proceedings. French Decl., Exh. E. In that examination, Jarvis, one of "Gateway's top executives," *see* French Decl. ¶ 11, states that eight-millimeter backup tapes will generally include e-mail files and accounting records, among other things. French Decl., Exh. E.

After a search of the storage facilities, French found a number of backup tapes, none of which contained e-mails. French Decl. ¶ 12. In the course of Gordon's visits to the storage facility, he never found any backup tapes containing e-mails. Gordon Decl. ¶ 9. Gordon states that the trustee handed Hagemeyer all the backup tapes discussed in the examination and that Hagemeyer had copied them. Gordon Decl. ¶ 8. He also states that a great number of the tapes in storage bear a small label with "Hagemeyer" written across them, signifying that the plaintiff has copied or inspected the tapes. *Id.* at ¶ 13.

Lastly, Hagemeyer seeks to compel Gateway to search the backup tapes for e-mails containing certain keywords at Gateway's own cost. According to French, Hagemeyer had offered to conduct the search at its own cost, but Gateway refused the offer. French 2d Decl. ¶¶ 5 & 6. Hagemeyer's belief that there are e-mails stored on the backup tapes is based on a handful of e-mails French read after doing a cursory search of "a couple of random diskettes" that he found at the storage facility. French Decl. ¶ 12; *See id.* Exh. F. In the e-mails, Gateway employees refer to a subsidiary of Hagemeyer and dis-

---

3. In a letter addressed to the Court, Rudolph states that Gateway stands by Gordon's statements.

4. Gordon attached photographs of the Phoenix mini-storage to his declaration showing a small shed lined with sturdy shelves. Gordon Decl. ¶ 6. The shelves were holding neatly-stacked, labeled boxes.

cuss a "config," which French presumes is a configuration related to the software at issue. *Id.* at ¶ 12.

According to Gordon, however, the e-mails Hagemeyer found on the diskettes were not relevant to the case at bar but referred to a prior transaction in which the subsidiary had bought computer hardware from a third party. *Id.* ¶ 14. In addition, Gordon states that it would be "extremely time-consuming and expensive" to conduct a search of the backup tapes. Gordon Decl. ¶¶ 10 & 11. Gordon states that much of the expense would arise because Gateway would need computer equipment it does not own; hardware, such as tape drives and servers, as well as the software that was in use at the time the backup tapes were made. *Id.* ¶ 10.

## II. DISCUSSION

### A. Documents Kept in the Usual Course of Business

■ A party responding to a document request under Rule 34 has a choice of producing the documents "as they are kept in the usual course of business" or of "organiz[ing] and label[ing] them to correspond with the categories in the request." Fed. R.Civ.P. 34(b). When producing documents, the responding party cannot attempt to hide a needle in a haystack by mingling responsive documents with large numbers of nonresponsive documents. *See Bratka v. Anheuser–Busch Co., Inc.,* 164 F.R.D. 448, 462–463 (S.D.Ohio 1995). However, according to the plain language of Rule 34, a responding party has no duty to organize and label the documents if it has produced them as they are kept in the usual course of business.

■ The documents in the Phoenix storage facility have not been moved since the trustee placed them there in June 1998. All other materials that were in the trustee's control have been placed in an office in Phoenix. The materials are kept in the usual course of business and are kept in clearly labeled boxes. No attempt has been made to hide responsive documents among nonresponsive documents. Although there is a dispute concerning the organization of the documents at the storage facility, the photographs attached to Gordon's Declaration sufficiently demonstrate that Hagemeyer's charges that the facility is a "document dump" are unfounded. Additionally, Hagemeyer has refused Rudolph's *bona fide* attempts to resolve the dispute by granting French access to the storage facility.

Since Gateway has discharged its duty to produce the documents as they are kept in the usual course of business, this portion of Hagemeyer's motion to compel production will be denied. However, Hagemeyer must be given continuing access to materials kept in the storage facility as well as in the office.

### B. Hagemeyer's Request for Computer Backup Tapes

■ Hagemeyer also seeks to compel production of a full backup of Gateway's e-mails. Any party may request production of documents within the possession, custody, or control of another party, subject to the qualifications of Rule 26(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 34(a). A party need not produce documents or tangible things that are not in existence or within its control. *Norman v. Young,* 422 F.2d 470 (10th Cir.1970); *see also* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil* § 2210 (2d ed.1994). It is sufficient that the discovered party respond by saying that a document or tangible thing is not in existence. 8A Wright, Miller & Marcus, *supra,* § 2213.

■ "In the face of a denial by a party that it has possession, custody or control of documents, the [requesting] party must make an adequate showing to overcome this assertion." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 147 (S.D.N.Y.1997) (quoting *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 525 n. 7 (S.D.N.Y.1992)); *cf. Clark v. Universal Builders, Inc.,* 501 F.2d 324, 339 (7th Cir. 1974) (in a class action lawsuit, the party requiring absent class members to submit to written interrogatories has the burden of

demonstrating the merits of discovery).[5] Records kept in the ordinary course of the business of a party are presumed to exist. *Goldman v. Checker Taxi Co.*, 325 F.2d 853, 856 (7th Cir.1963). The Court does not presume that all e-mails are kept in the regular course of business. *See Sithon Maritime Company v. Holiday Mansion*, No. Civ. A. 96–2262–EEO, 1998 WL 638372, at *4 (D.Kan. Sept.14, 1998).

■ Hagemeyer has failed to establish the existence of a backup tape containing a full copy of Gateway's e-mails. The trustee, and later Gateway, allowed Hagemeyer ample opportunity to search the backup tapes for e-mails. The labels on the backup tapes signify that Hagemeyer has taken advantage of this opportunity and has copied and/or inspected a number of them, with unsatisfactory results. Gordon concurred with Hagemeyer's findings, when in his sworn declaration, he stated that none of Gateway's backup tapes appear to contain e-mails. He also believes that it is doubtful that there are backup tapes in existence other than those which Gateway has already produced.

Hagemeyer relies entirely on the Rule 2004 Examination, in which Jarvis states that computer backup tapes *potentially* record company e-mails, for the existence of additional tapes. Absent a more substantial showing, the Court will not grant Hagemeyer's motion to compel production of e-mail backup tapes inasmuch as it seeks backup tapes other than those already produced by Gateway. If Hagemeyer persists in the belief that a backup of Gateway's e-mails exists, it is not foreclosed from using other methods to discover them. *See Bank of New York*, 171 F.R.D. at 152.

### C. Shifting the Costs of Searching Computer Backup Tapes

Besides requesting Gateway to produce additional backup tapes, Hagemeyer asked Gateway to search all of its backup tapes for e-mails containing certain search terms. Gateway refused, citing the undue burden and expense involved in restoring the documents and then searching them. Hagemeyer also offered to search the tapes at its own expense, but Gateway refused.[6] Hagemeyer now moves to compel Gateway to restore and search the backup tapes. Gateway argues that Hagemeyer should defray the costs of restoration because they are too burdensome.[7] There are, therefore, "competing hardships" that the Court must balance: Gateway's-for having to search the tapes at great expense-and Hagemeyer's-for being deprived of potentially useful information. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir.1984).

A party may discover "any matter, not privileged, that is relevant to the claim or defense of any party ...." Fed.R.Civ.P. 26(b)(1). The Court may limit discovery, however, if it finds that the discovery request is more easily obtained from another source,

---

**5.** Under the former Rule 34 the responding party had to make a more formal showing (e.g., by sworn affidavit) that the materials sought were not in existence or that the party was not in possession, custody, or control. 8A Wright, Miller & Marcus, *supra*, §§ 2210 & 2213; *See Norman*, 422 F.2d at 473 ("[N]ever did defendants deny in writing ... that the documents existed. [Hence], defendants failed to establish their inability to comply with the order") and *Jensen v. Boston Insurance Co.*, 20 F.R.D. 619, 621 (N.D.Cal.1957) (objecting party must deny existence under oath). The 1970 amendments revised Rule 34 to have it operate extrajudicially, rather than by court order, doing away with the requirement for a sworn denial. Fed R. Civ. P. 34, Advisory Committee's Note to the Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 527 (1970). See *Von Der Heydt v. Rogers*, 251 F.2d 17, 18 (D.C.Cir.1958) and *Wharton v. Lybrand*, *Ross Bros. & Montgomery*, 41 F.R.D. 177, 180 (E.D.N.Y.1966), for examples of the formal burden-shifting that existed pre–1970.

**6.** Gateway may have had good reason to do so, since it might inadvertently waive any claim of privilege if Hagemeyer views and seeks to use protected material. *See, e.g., International Digital Systems Corp. v. Digital Equipment Corp.*, 120 F.R.D. 445, 448–450 (D.Mass.1988).

**7.** Although Gateway did not properly file a motion for a protective order under Rule 26(c) of the Federal Rules of Civil Procedure, it affirmatively argued for cost-shifting in its response brief to Hagemeyer's motion to compel. For purposes of deciding this motion, the Court will regard Gateway's arguments concerning cost-shifting as though they were included in a brief accompanying a properly filed motion.

including information already collected; that the requesting party has had sufficient opportunity to obtain discovery; or that the request is unduly burdensome or expensive. Fed.R.Civ.P. 26(b)(2). Rule 26(b)(2)(iii) provides five factors to help the Court determine whether the burden or expense of a discovery request is proportional to the needs of the case:

The frequency or extent of use of ... discovery ... shall be limited by the court if it determines that:

\* \* \* \* \* \*

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account [(A)] the needs of the case, [(B)] the amount in controversy, [(C)] the parties' resources, [(D)] the importance of the issues at stake in the litigation, and [(E)] the importance of the proposed discovery in resolving the issues.

■ There is a presumption that "the responding party must bear the expense of complying with discovery requests ...." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, 98 S.Ct. 2380, 2393, 57 L.Ed.2d 253 (1978). However, when the request violates the Rule 26(b)(2) proportionality test, the Court may "condition[ ] discovery on the requesting party's payment of the costs of discovery." *Id.* at 358, 98 S.Ct. 2380; *see also Zubulake v. U.B.S. Warburg LLC*, 216 F.R.D. 280, 283 (S.D.N.Y.2003) ("*Zubulake III*").[8] The party opposing discovery must show good cause for its refusal and, thus, bears the burden of proof. *Oppenheimer Fund*, 437 U.S. at 358, 98 S.Ct. 2380.

### 1. The Unique Burden of Producing Backup Tapes

Gateway raises the issue of cost shifting by stating that restoring and searching the backup tapes would be "extremely time-consuming and expensive." In support of this claim, Gordon states that Gateway would have to acquire or use computer hardware and software that it does not own to retrieve information stored on the backup tapes.[9] The Court must decide whether the burden and expense of acquiring computer hardware and software and paying an attorney to review the contents of the tape for privilege outweigh the benefit of relevant information. In order to effectively answer this question, the Court must first ask, "What is the expense of retrieving information from a backup tape?"

Backup tapes record a "snapshot" of the contents of the computer system at the moment the backup is run. *See McPeek v. Ashcroft*, 202 F.R.D. 31, 32 (D.D.C.2001) ("*McPeek I*"). "The data on a backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system." Kenneth J. Withers, *Computer–Based Discovery in Federal Civil Litigation*, 2000 Fed. Ct. L.Rev. 2, 5 (2000). In case the system "crashes," and all the information created since the previous backup is lost, the contents of the tape can be loaded onto the system, restoring the lost information. *See Zubulake v. U.B.S. Warburg LLC*, 217 F.R.D. 309, 314 (S.D.N.Y.2003) ("*Zubulake I*"). Since crashes presumably occur infrequently, backup tapes need not be as convenient to access as, say, a CD–ROM. At the same time, backup tapes must have the capacity to store large amounts of information since they are relied upon to replace all the information contained on a computer system after a crash. It is understandable, then, that backup tapes sacrifice accessibility for storage capacity, since to have both would be impractical and costly. *See, e.g., Internet-News.Com*, http://inews.webopedia.com/TERM/t/tape_drive.html (last visited Aug. 9, 2004) (stating that tapes are the least expensive media for making backups). Indeed, one court has revealed a correlation between the inaccessibility of backup tapes and the cost of searching them. *Zubulake I*, 217 F.R.D. at 318–320.

---

8. There are two published decisions issued in the *Zubulake* action which will be cited in this decision.

9. The Court is aware that using litigation support services that specialize in backup tape searches obviates Gateway's need to acquire this equipment. These services, however, are commonly expensive.

One of the reasons for the high cost of searching backup tapes is that they store more information than most other storage media. To illustrate, a CD–ROM's storage capacity is 650 megabytes, the equivalent of 325,000 typewritten pages; computer networks create backup data measured in tera-bytes–1,000,000 megabytes-which is the equivalent of 500 billion typewritten pages. *Manual for Complex Litigation (Fourth)* § 11.446 (2004).

Additionally, backup tapes require more time and labor to search than other media because of the way data is organized on them; "tape drives ... are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks." *InternetNews.Com, supra,* (quoted in *Zubulake I,* 217 F.R.D. at 319). This type of organization is a main reason that each backup tape may take anywhere from several minutes to five days to restore. *Zubulake I,* 217 F.R.D. at 314. Adding to the difficulty, each must be restored separately onto a hard drive in order to be searched. *Id.*

Accordingly, the cost to review the backup tapes can be hundreds of thousands of dollars depending on the number of tapes that are to be searched. *See Byers,* 2002 WL 1264004, at *11 (between $20,000 and $30,000); *Zubulake III,* 216 F.R.D. at 287 (applying *Zubulake I* and partially shifting costs to requesting party; $2,304.93 per tape); *Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421, 431 (S.D.N.Y. 2002) (between $158,000 and $236,000); *Medtronic Sofamor Danek, Inc. v. Michelson,* No. 01–2373–M1V, 2003 WL 21468573, at *8 (W.D.Tenn. May 13, 2003) (several million dollars for 996 backup tapes).

### 2. Different Approaches to Cost–Shifting

A number of district courts have recognized the unique burden of producing documents stored on backup tapes and, by invoking Rule 26(c) to fashion orders to protect parties from undue burden or expense, have conditioned production on payment by the requesting party. *See, e.g., Zubulake I,* 217 F.R.D. 309; *Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421 (S.D.N.Y.2002); *McPeek v. Ashcroft,* 202 F.R.D. 31 (D.D.C.2001); *Medtronic Sofamor Danek, Inc. v. Michelson,* No. 01–2373–M1V, 2003 WL 21468573 (W.D.Tenn. May 13, 2003); and *Byers v. Illinois State Police,* No. 99–C–8105, 2002 WL 1264004, at *11 (N.D.Ill. June 3, 2002). Although the power to shift the costs of discovery is discretionary, these courts have identified four approaches to help them determine when cost-shifting is proper. *See* Stephen D. Williger & Robin M. Wilson, *Negotiating the Minefields of Electronic Discovery,* 10 Rich. J.L. & Tech. 52, at ¶¶ 13–25 (2004). The Court of Appeals for this circuit has not addressed this issue.

### a. Cost–Benefit Analysis

Cost-benefit analysis is a strict cost-based approach that requires the most primitive cost-shifting analysis: the requesting party always bears the burden of producing computer-generated data. Marnie H. Pulver, Note, *Electronic Media Discovery: The Economic Benefit of Pay–Per–View,* 21 Cardozo L.Rev. 1379 (2000). Cost-benefit analysis is based, as its title suggests, on economic principles, most importantly "that an individual will pay what he assumes is a fair value for that which he seeks." *Id.* at 1398. Proponents of this approach argue that since the costs of responding to requests for electronic discovery are higher than those for other types of discovery, it is especially fertile territory for abuse. In short, it is in the requesting party's best interest to demand more discovery than it needs in order to increase the responding party's costs of litigation. If the requesting party bears the costs of producing electronically stored documents, it will only request what it needs for the case.

The Court rejects this approach for two reasons: first, it fails to accommodate documents stored on electronic media that are cheaper to produce than paper-based documents and, second, it ignores the presumption that the requesting party pays the costs of production.[10]

---

10. For additional criticism of this analysis, see *McPeek I,* 202 F.R.D. at 34.

### b. The Marginal Utility Approach

The marginal utility approach, like the cost-benefit analysis which it rejects, is based on economic principles: "[t]he more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense." *McPeek I*, 202 F.R.D. at 34. The court in *McPeek I*, which originated the marginal utility approach, delayed deciding whether to shift the costs of restoration until it knew the likely costs and benefits. *Id.* To that end, the court ordered the responding party to search a sample of the backup tapes and to produce any responsive e-mails from that sample, keeping record of its monetary cost. *Id.* at 34–35. Besides making the cost-shifting analysis fact-based, the marginal utility approach adheres closely to the Rule 26(b)(2) proportionality test.

### c. The Rowe Test

The test that was used by the court in *Rowe* balanced eight factors:

(1) the specificity of the discovery requests;

(2) the likelihood of discovering critical information;

(3) the availability of such information from other sources;

(4) the purposes for which the responding party maintains the requested data;

(5) the relative benefit to the parties of obtaining the information;

(6) the total cost associated with production;

(7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party.

205 F.R.D. at 429. Although for a time the *Rowe* test was "the gold standard," *Zubulake I*, 217 F.R.D. at 320, it has a few shortcomings. First, the *Rowe* test omits two factors specified in Rule 26(b)(2)(iii) of the Federal Rules of Civil Procedure: (1) the amount in controversy and (2) the importance of the issues at stake in the litigation. *Id.* at 321. Second, the fourth factor, i.e., the purposes

for retaining the data, has no direct impact on the accessibility of computerized information and is, therefore, nonessential to determining the likely costs of production. *Id.* at 321–322. Finally, the approach is flawed because "courts have given equal weight to all of the factors, when certain factors should predominate." *Id.* at 320.[11]

### d. The Zubulake Factors

The court in *Zubulake I*, after identifying the defects in the *Rowe* test, created a new seven-factor test. *Id.* at 322. The *Zubulake* test takes into consideration:

(1) The extent to which the request is specifically tailored to discover relevant information;

(2) The availability of such information from other sources;

(3) The total cost of production, compared to the amount in controversy;

(4) The total cost of production, compared to the resources available to each party;

(5) The relative ability of each party to control costs and its incentive to do so;

(6) The importance of the issues at stake in the litigation; and

(7) The relative benefits to the parties of obtaining the information.

*Id.* The *Zubulake* factors improved the *Rowe* test because, unlike the *Rowe* test, the *Zubulake* factors are weighed in descending order of importance, not equally. *Id.* at 323. Thus, the first two factors, which mirror the marginal utility test found in *McPeek I*, are the most important. *Id.* Furthermore, the court in *Zubulake I*, like the *McPeek I* court, ordered the responding party to produce responsive documents from a sample of backup tapes. *Id.* at 324. Therefore, the court was able to base its cost-shifting analysis on facts rather than speculation.

### 3. Conclusion

■ In short, *Zubulake* brought the cost-shifting analysis closer to the Rule 26(b)(2) proportionality test by adding two of the factors that *Rowe* had omitted and made the analysis dependent on the facts of the case. For these reasons, the Court is persuaded by

---

**11.** For additional criticism of the *Rowe* test, see *Zubulake I*, 217 F.R.D. at 320–322.

the reasoning in *Zubulake* and will adopt the seven-factor *Zubulake* test.

 Rule 26(c) of the Federal Rules of Civil Procedure gives the Court broad discretion to create any order that would spare a party undue burden or expense, including orders shifting the costs of production. *Spears v. City of Indianapolis,* 74 F.3d 153, 158 (7th Cir.1996); *Deitchman,* 740 F.2d at 564. However, the Court should only issue such an order when a request truly threatens to subject the responding party to undue burden or expense. Therefore, the Court will follow the reasoning of *McPeek* and *Zubulake* and require Gateway to restore a sample of backup tapes and require the parties to make additional submissions addressing whether the burden or expense of satisfying the entire request is proportionate to the likely benefit. The Court will then further address the search of Gateway's backup tapes. To accommodate this process, the Court, though mindful that this case is aging, will set new final pretrial conference and trial dates.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1). Hagemeyer's Motion to Compel Discovery from Gateway (Docket # 79) is **DENIED** in part and **GRANTED** in part.

a). **No later than August 27, 2004,** Hagemeyer shall file a statement narrowing its search criteria by specifying what e-mails it seeks from Gateway, including their dates, their subject, their likely content, and their sender.

b). **No later than September 27, 2004,**Gateway shall produce responsive e-mails from any five backup tapes of Hagemeyer's choosing; shall serve and file a brief addressing whether the search results were productive; and shall attach a sworn affidavit to the brief detailing the results of that search and the time and money spent.

c). **No later than October 18, 2004,** Hagemeyer shall file any response thereto.

d). **No later than November 1, 2004,** Gateway shall file any reply.

e). Both parties shall file sworn affidavits by **November 1, 2004,** stating the current amount in controversy, the number of tapes to be searched, the dates the tapes were created, and the resources available to the parties for purposes of this litigation.

2). The final telephonic pretrial conference currently set for September 7, 2004, is **RESCHEDULED** for **February 14, 2005 at 3:00 p.m.**

3). The three-week jury trial set to commence on October 4, 2004, is **RESCHEDULED** for **March 7, 2005 at 9:00 a.m.**

**SO ORDERED,**