In re Michael J.D. SMITH and Sandra
Rose Smith, Debtors.

Michael J.D. SMITH and Sandra
Rose Smith, Appellants,

v.

CHILD SUPPORT ENFORCEMENT,
Appellee.

Bankruptcy No. 93–C–25852.
No. 94–C–1228W.

United States District Court,
D. Utah,
Central Division.

April 13, 1995.

Jory L. Trease, Sherry Palmer & Associates, West Valley City, UT, for appellants.

Michael G. Barker, Salt Lake City, UT, for appellee.

Paul J. Toscano, Chapter 13 Trustee, Salt Lake City, UT.

## MEMORANDUM DECISION AND ORDER AFFIRMING DENIAL OF DEBTORS' OBJECTION TO PROOF OF CLAIM

WINDER, Chief Judge.

This matter is before the court on debtors and appellants Michael J.D. Smith's ("Mr. Smith") and Sandra Rose Smith's (collectively "Debtors") appeal of an order entered by the Honorable Glen E. Clark, Chief United States Bankruptcy Court Judge, on September 12, 1994, denying debtors' objection to a proof of claim. The court conducted a hearing on Debtors' appeal on April 3, 1995. At the hearing, Debtors were represented by Jory L. Trease. Michael G. Barker appeared on behalf of appellee Child Support Enforcement ("CSE").

Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. The court had also read certain of the authorities cited by the parties. Following oral argument, and after taking the matter under advisement, the court has further considered the law and facts relating to this appeal. Now being fully advised, the court enters the following memorandum decision and order.

## I. BACKGROUND

Appellant Mr. Smith and Claudette M. Demars (Rayl) ("Ms. Rayl"), the parents of three children, were divorced in May of 1975. The original divorce decree ordered Mr. Smith to pay a total of $300 per month in child support. Modification of the decree in August of 1979 reduced this amount to $65 per child, per month.

Ms. Rayl contends that by January of 1993, Mr. Smith was $10,957.41[1] in arrears in his child support obligations. Ms. Rayl's individual efforts to collect the debt had been unsuccessful. Furthermore, although Ms. Rayl had never received public assistance, she had asked the Utah State Office of Recovery Services to assist her in recovering the delinquent balance. Their efforts were also unsuccessful.

On January 29, 1993, Ms. Rayl sought assistance in collecting Mr. Smith's debt from CSE, which is privately owned and operated, and which has no affiliation with any governmental agency or political subdivision thereof. On that date, Ms. Rayl signed a collection agreement ("Agreement") specifying that CSE agreed to: (1) make reasonable efforts to collect child support for Ms. Rayl, (2) advance collection services,[2] attorney fees, and court costs,[3] and (3) remit to Ms. Rayl any monies collected no later than the 15th of the month following collection or following clearance of checks or drafts tendered by Mr. Smith. The Agreement further specified that Ms. Rayl would: (1) pay CSE a $5 retainer to initiate collection action, (2) pay CSE a commission for its collection services,[4] (3) pay CSE for commissions and for legal fees and court costs advanced if Ms. Rayl either settled directly or received payment from Mr. Smith, or withdrew from the collection program after collection had begun or after CSE had advanced services or costs. In addition, the Agreement gave Ms. Rayl discretion to terminate without charge if CSE failed to collect monies for twelve months consecutively. *See* Agreement at ¶ 9. Although CSE could terminate the Agreement at any time, such termination would release Ms. Rayl from payment of any charges. *See id.* The Agreement further specified that Ms. Rayl agreed "to send or

1. This figure includes interest. *See* Appellee's Brief at p. 3, Case No. 94–C–1228W (Jan. 30, 1995). Without interest, the sum appears to have been $7,788.00. *See* Collection Agreement at ¶ 15 (Jan. 29, 1993) [hereinafter "Agreement"].

2. These might include investigative work, telephone charges, document preparation, etc. *See* Agreement at ¶ 3.

3. The Agreement specified that if these costs could be charged to the absent parent, CSE would do so. If they could not, "by policy or order of the court," the client would not be required to reimburse CSE. Agreement at ¶ 4.

4. CSE's commission is 28% of monies collected before legal action is taken, and 33% of monies collected after legal action ensues. Agreement at ¶ 7.

deliver to CSE any child support payments (or the commission amount owed to CSE) received by [Ms. Rayl] within 5 days of receipt." *Id.* at ¶ 12. Finally, Ms. Rayl agreed to sign a " 'power of attorney' or an 'assignment and power of attorney,' thereby giving CSE authority to act in [Ms. Rayl's] place to collect child support." *Id.* at ¶ 13. The arrearages that CSE agreed to collect extended over an eight-year period—from February, 1985 to January, 1993. *Id.* at ¶ 15.

In March of 1993, CSE had notified the Honorable Michael R. Murphy, State of Utah Third District Court Judge, of its intention to proceed in child support collection cases pursuant to the power of attorney executed in its favor by its clients. *See* Letter to Stephen L. Johnston (CSE counsel) from Judge Michael R. Murphy at 1 (Mar. 2, 1993) [hereinafter "Judge Murphy's letter"]. Without making any determination as to the validity of CSE's proposed course of action, Judge Murphy's letter in response alerted CSE to what might be an issue as to the unauthorized practice of law in such situations.[5] Judge Murphy also informed CSE that, even if a problem with the unauthorized practice of law did not prevent CSE's proposed course of action, "the attorney acting pursuant to this 'power of attorney' will be required to respond to all appropriate notices, motions and requests of the court as to all issues. Because Child Support Enforcement cannot insulate itself solely to the collection of child support, there should be a clear understanding with the client that the attorney in question will be that client's attorney for all issues in the pending litigation." *Id.* at 1–2.

CSE's efforts to arrange voluntary payment from Mr. Smith were unsuccessful.

CSE therefore sought involuntary payment through court action. On July 13, 1993, acting pursuant to the cautions in Judge Murphy's letter, Ms. Rayl executed an "Assignment of Child Support Arrears for Collection" ("Assignment for Collection"). Under the terms of the Assignment for Collection, Ms. Rayl granted CSE "full power to sue for, collect, reassign or in any other manner enforce collection." *See* Assignment for Collection at 1 (July 13, 1993). The Assignment for Collection also appointed CSE as Ms. Rayl's attorney in fact, with authority "to demand, recover, collect and received (*sic*) all sums of money as are now past-due relating to the foregoing claim for past due child support." *Id.* Finally, the Assignment for Collection specified that it was "subject to the terms of the Collection Agreement." *Id.*

On November 3, 1993, Debtors filed a Chapter 13 petition in bankruptcy court. Three months later, on about January 21, 1994, CSE filed a Proof of Claim asserting a $11,729.64[6] debt owed by Mr. Smith for past-due child support. Debtors filed an objection, pursuant to 11 U.S.C. § 502, asserting that the status of the claim should receive general unsecured treatment because it had been voluntarily assigned by Ms. Rayl to CSE, a non-governmental agency. *See* 11 U.S.C. § 523(a)(5)(A). On July 19, 1994, Chief Judge Clark conducted a hearing on the objection. At the conclusion of testimony, Chief Judge Clark overruled Debtors' objection, finding that the arrangement between Ms. Rayl and CSE was nothing more than a contingency fee arrangement.[7]

The sole issue on appeal is whether the Assignment for Collection executed by Ms. Rayl is an assignment as contemplated by 11 U.S.C. § 523(a)(5)(A), which would effectively

---

**5.** Judge Murphy wrote: "I understand that persons who are not licensed to practice law on occasion use something called 'power of attorney.' Nevertheless, when such a person acts as an attorney before a court pursuant to such 'power of attorney', there may well be an issue of unauthorized practice of law." Judge Murphy's Letter at 1.

**6.** This court expresses no opinion as to the validity or accuracy of this figure.

**7.** Chief Judge Clark stated:

The agreement entered into by Ms. Rayl and CSE Co. is not the type of assignment anticipated by 11 USC § 523(a)(5)(A). Thus, the agreement does not make the claim for past-due child support a dischargeable claim. The agreement between Ms. Rayl and CSE Co. represents essentially a contingency fee arrangement and does not change the nature of the child support obligation.

*See* Order Pursuant to Debtor's Objection to Proof of Claim at p. 2, Bankruptcy Case No. 93–C–25852 (Sept. 12, 1994).

transform Mr. Smith's child support debt into a dischargeable claim.[8] Debtors' argument is generally this: Under fundamental contract law principles, the Assignment for Collection meets all of the requirements for a valid assignment. Therefore, applying the plain language doctrine to § 523(a)(5)(A), Ms. Rayl voluntarily assigned her claim for past child support to CSE, a non-governmental agency, and the debt is dischargeable.

In opposition, CSE argues that any assignment was not a "true" assignment, but was simply an assignment for collection which does not fall within the purview of § 523(a)(5)(A). CSE asserts that case law distinguishes between dischargeable true assignments and nondischargeable assignments for collection on the following bases: (1) Has the nature of the obligation changed from child support to something else? (2) Will the custodial parent receive any present benefit if the noncustodial parent makes a payment? (3) Have the custodial parent's interests in the monies been terminated? (4) Does the custodial parent maintain control over the obligation? (5) Did the custodial parent receive consideration in exchange for the assignment? (6) What are the public policy considerations as applied to each?

## II. *STANDARD OF REVIEW*

■■■ This case involves an appeal from the Bankruptcy Court's denial of a debtor's objection to a proof of claim. In reviewing the Bankruptcy Court's order in this case, this court must "apply the same standards of review as those governing appellate review in other cases." *In re Perma Pac. Properties,* 983 F.2d 964, 966 (10th Cir.1992). This court therefore must affirm the Bankruptcy Court's findings of fact unless those findings are clearly erroneous. *In re Davidovich,* 901 F.2d 1533, 1536 (10th Cir.1990).[9] Where the Bankruptcy Court has made conclusions of law, however, this court is required to conduct a de novo review of the record and reach an independent legal conclusion. *Id.* at 1536.[10] Finally, because certain matters in bankruptcy are left entirely to the discretion of the bankruptcy judge,[11] this court may reverse a decision on those issues only if the Bankruptcy Court abused its discretion. *See, e.g., Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 563–64 (7th Cir.1984).[12]

## III. *ANALYSIS*

Preliminarily, the court notes its awareness of the policy considerations behind Debtors' argument in favor of the dischargability of Mr. Smith's debt—*i.e.,* that a primary purpose of the Bankruptcy Code is to provide a fresh start for certain debtors. There are, however, other considerations that Congress has determined will override a debtor's interest in a fresh start. As the United States Supreme Court recognized in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991):[13]

8. Because these matters do not appear to have been considered by the bankruptcy court, this court will not consider whether the nature of this obligation is actually child support, or whether the $11,729.64 figure is accurate.

9. A finding of fact is clearly erroneous when the court, after reviewing the record, is "left with the conviction that a mistake has been made." *LeMaire By and Through LeMaire v. United States,* 826 F.2d 949, 953 (10th Cir.1987).

10. In reviewing mixed questions of law and fact, however, this court conducts a de novo review only if the question involves primarily legal principles. *See In re Wes Dor, Inc.,* 996 F.2d 237, 241 (10th Cir.1993) (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 940 F.2d 564, 572 (10th Cir.), *cert. denied,* 502 U.S. 983, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991)). If the question involves primarily a factual inquiry, this court applies the clearly erroneous standard. *Id.*

11. For example, the decision to confirm, deny, or vacate the sale of a debtor's property is within the bankruptcy court's sole discretion. *See, e.g., In re Chung King, Inc.,* 753 F.2d 547, 549 (7th Cir.1985).

12. The Bankruptcy Court abuses its discretion when either (1) its decision is based on erroneous conclusions of law, (2) its factual findings are clearly erroneous, or (3) when the record contains no evidence to support the judge's conclusions. *See In re AM Int'l, Inc.,* 67 B.R. 79, 81 (Bankr.N.D.Ill.1986).

13. In *Grogan,* the Court found that preponderance of the evidence, rather than clear and convincing, is the proper standard for proving § 523(a) dischargability exceptions. *Grogan,* 498 U.S. at 286, 111 S.Ct. at 659. In adopting the higher standard, the Court explicitly rejected a "fresh start" argument. *Id.*

This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." But in the same breath that we have invoked this "fresh start" policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor."

The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support.... Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start.

*Id.* at 286–87, 111 S.Ct. at 659 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Situated squarely within the context of these two competing considerations is the issue here presented: Pursuant to 11 U.S.C. § 523(a)(5)(A), was the child support debt owed to Ms. Rayl "assigned to another entity, voluntarily, by operation of law, or otherwise," thereby becoming dischargeable?

The court has found no cases directly on point. However, other jurisdictions have examined related issues, which appear to reach consistent results, and which are persuasive here. These cases either implicitly or explicitly distinguish between two types of assignments: (1) "true" assignments, which are dischargeable under § 523(a)(5)(A), and (2) assignments for collection purposes, which are nondischargeable.

In analyzing this issue, one factor frequently used to distinguish between a true assignment and an assignment for collection is "whether or not the nonpaying spouse will receive any present benefit from the pay-

ment of the debt." *Stranathan v. Stowell,* 15 B.R. 223, 226 (Bankr.D.Neb.1981). This factor was used in *In re Mozingo,* 153 B.R. 276 (Bankr.W.D.Mo.1993), wherein an assignment was found to be dischargeable. *Id.* at 278. There, a husband had been ordered in a divorce action to pay his ex-wife's maintenance and her attorney's fees. *Id.* at 277. The wife later assigned to her attorney—"as and for partial settlement of his fees"—"all her right, title, and interest" both in the attorney's fees and in the past-due maintenance. *Id.* In finding the maintenance debt dischargeable, the court pointed out that "[t]here is no reason to believe that any funds paid by this debtor will ever enhance the position of the former spouse." *Id.* at 278.

Similarly, in *In re Fields,* 23 B.R. 134 (Bankr.D.Colo.1982), *aff'd in part, rev'd in part, Zimmerman v. Starnes,* 35 B.R. 1018 (D.Colo.1984),[14] the court found dischargeable a child support arrearage owed to an ex-spouse who had filed a Chapter 7 voluntary petition, thereby transferring her interest in the debt to a bankruptcy trustee. *Id.* at 135. In its analysis, the court examined cases dealing with assignments to collect arrearages due, and pointed out that whenever a debt was found nondischargeable, "[t]he theme running through ... is that the payment of alimony, maintenance, or support must give some direct benefit to the spouse or child." *Id.* at 136. The court then stated that "it is clear that in this case [the ex-spouse] will receive no present benefit under the *Stranathan* test, nor any direct benefit from the payment of this child support arrearage." *Id.* at 136.

This reasoning is also explicit in *In re Reichurdt,* 27 B.R. 751 (Bankr.W.D.Wash. 1983), a case which Debtors point to as one whose factual similarities to the case at hand "cannot be overlooked." *See* Appellants' Reply at p. 19, Case No. 94–C–1228W (Mar. 8, 1995) [hereinafter "Appellants' Reply"]. The cases *are* similar in the sense that in *Reichurdt,* an ex-spouse executed an "Assign-

---

**14.** The District Court reversed on the grounds that, under applicable law, the right to receive the back child support belonged to the child and not the wife. *Starnes,* 35 B.R. at 1021–22. Thus,

the debt should not have been part of the ex-wife's estate and could not have been assigned to the trustee. *Id.* at 1022.

ment of Back Child Support" in favor of a non-governmental collection agency. *Id.* at 752. However, any similarity between *Reichurdt* and this case ceases at that point. In *Reichurdt*, the document: (1) explicitly assigned and transferred "all [the ex-spouse's] right, title and interest ... in the amount of $22,200.00 plus interest" to the collection agency, (2) gave the collection agency full power "to collect, compromise, sue for and discharge" the debt, and (3) specified that the ex-spouse must pay the collection agency $11,100 if she wished to cancel the assignment "anytime after work has been performed to initiate collection." *Id.* at 752. Fifteen months after this document was signed, an agreed judgment in the amount of $11,000 was entered in favor of the ex-spouse and the collection agency. Ten months after that, the husband filed for bankruptcy, listing the $11,000 judgment as a debt. *Id.*

. The *Reichurdt* court found this assignment to be a "true" one. *See id.* at 753. Moreover, in doing so the court recognized the existence of nondischargeable assignments for collection purposes, and cited as examples *Matter of Beggin*, 19 B.R. 759 (Bankr. W.D.Wash.1982) [15] (assignment of child support to state for collection purposes), and *In re Deblock*, 11 B.R. 51 (Bankr.N.D.Ohio 1981) (assignment of child support rights to law firm for collection). Contrasting the contingent nature of these agreements to the facts in its case, the court pointed to the $11,100 that inured to the agency if the ex-spouse cancelled "anytime after work has been performed to initiate collection," and declared that "[t]his reflects more than an intent to make a mere assignment for collection purposes only. It was intended to be a true assignment." *Reichurdt*, 27 B.R. at 753. In its reasoning, the court stated specifically that "[t]he public policy in favor of the debtor's former spouse and children is only afforded where said parties derive a direct

benefit from alimony, child support or maintenance." *Id.*

In this court's view, the evidence presented clearly distinguishes this case from *Reichurdt* as well as from other cases wherein the "assignment" was held to be a dischargeable "true" assignment. There is no doubt that Ms. Rayl will be directly benefited by the payment of Mr. Smith's debt. Furthermore, there is no evidence that she was indebted [16] to CSE prior to executing the Assignment for Collection, nor has she received anything from CSE in exchange for executing it. In fact, Ms. Rayl paid a retainer fee to CSE. Nor does CSE have power to discharge or compromise the debt, having been granted power only to "sue for, collect, reassign or in any other manner enforce collection." *See* Assignment for Collection at 1. In particular, CSE would receive nothing beyond the $5 retainer if Ms. Rayl later cancelled after twelve consecutive months of non-collection by CSE—even if Mr. Smith later paid his debt in full. In sum, the court finds that Ms. Rayl's intent was not to effect the type of assignment anticipated by § 523(a)(5)(A), but simply to enter into what is essentially a contingency fee arrangement with CSE.

## IV. *ORDER*

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. The Bankruptcy Court's order denying Debtors' objection to CSE's proof of claim is AFFIRMED.

2. CSE is awarded its costs.

---

**15.** Debtors' statement that *Reichurdt* "specifically overruled" *Beggin* is inaccurate. *See* Appellants' Reply at p. 20. *Reichurdt* simply used *Beggin* as an example of a nondischargeable assignment for collection: "[t]his court previously held that a child support debt which has been assigned to the state for collection purposes only is not in the nature of a true assignment." *Reichurdt*, 27 B.R. at 753 (citing to *Beggin*).

**16.** In *In re Deblock*, wherein the court held that an assignment of a judgment to a law firm for collection purposes was not intended to be a true assignment, it was pointed out that the ex-spouse had not been indebted to the firm before assigning the judgment. *Deblock*, 11 B.R. at 53.