694 F.2d 1081
 William WASHINGTON and Judy Washington, Plaintiffs-Appellants,
v.
SHERWIN REAL ESTATE, INC., an Illinois corporation;
Michigan Avenue Bank, an Illinois Banking corporation, U/T #
2056; Sherwin Management, Inc., an Illinois corporation;
and Unknown Owners, Defendants-Appellees.
 No. 82-1184.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 16, 1982.
Decided Dec. 8, 1982.
 
 F. Willis Caruso, Leadership for Metropolitan Open Communities, Chicago, Ill., for plaintiffs-appellants.
 Joel J. Sprayregen, Aaron, Schimberg, Hess, Rusnak, Deutsch & Gilbert, Chicago, Ill., for defendants-appellees.
 Before ESCHBACH and COFFEY, Circuit Judges, and DUMBAULD, Senior District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the District Court for the Northern District of Illinois, Eastern Division, the Honorable J. Sam Perry presiding. The district court rendered judgment in favor of the defendants in this housing discrimination action after a bench trial in which the plaintiffs Judy and William Washington proceeded pro se. We agree that the district court did not abuse its discretion by allowing the plaintiffs' attorney to withdraw and by then directing the plaintiffs to present their case pro se without a continuance. We further agree that the district court's finding of no actionable discrimination under the facts of this case is not clearly erroneous. Accordingly, the judgment of the district court is affirmed.
 
 
 2
 The plaintiffs in this action, Judy and William Washington, are a black couple who allege the defendants discriminated against them by refusing to rent them an apartment. The plaintiffs brought suit against Sherwin Real Estate Inc. (the rental agent for the apartment), Sherwin Management, Inc. (the manager of the apartment complex), and the Michigan Avenue Bank (the owner of the apartment), alleging violations of the Civil Rights Act of 1866 (42 U.S.C. Sec. 1982) and the Fair Housing Act of 1968 (42 U.S.C. Sec. 3601 et seq.).
 
 
 3
 This suit arises from the defendants' refusal to rent a townhouse apartment located in the Colonial Investment Apartment project in Evanston, Illinois to the Washingtons. The Colonial Investment project, consisting of a total of thirty-eight apartment units, is subdivided into two groups of buildings located on opposite sides of Ridge Avenue in Evanston. According to evidence introduced at trial, the Colonial Investment project was racially integrated; during the period in controversy, 1978 to 1979, at least half of the project's thirty-eight units were rented to blacks.
 
 
 4
 In May of 1978, the defendant Sherwin Real Estate ran a newspaper advertisement listing as for rent a townhouse apartment in the Colonial Investment project. Responding to this notice, the Washingtons arranged to see the townhouse with a Sherwin representative. On June 1, 1978, the Washingtons were shown one of the townhouse units, located at 729 Dobson Street in Evanston. Arlyne Saskill, a white woman also interested in renting the townhouse, viewed the apartment at the same time as the Washingtons. Saskill and the Washingtons both filled out applications for the 729 Dobson Street townhouse after viewing the premises. While viewing the apartment, Saskill apparently told the Sherwin Real Estate representative that she was a former client of Sherwin Real Estate and that she was a social acquaintance of Samuel Sherwin, president of Sherwin Real Estate, although she did not list Mr. Sherwin as a reference on her application. The Washingtons, on the other hand, had had no prior dealings with Sherwin Real Estate and were not personally acquainted with any Sherwin Real Estate personnel.
 
 
 5
 Samuel Sherwin, president of Sherwin Real Estate, testified at trial that it was company policy to give preference in renting apartments to the firm's former clients. Accordingly, Mr. Sherwin, after being told that Saskill had applied for the townhouse, directed that Saskill be allowed to rent the unit. In fact, Mr. Sherwin testified that at the time the decision was made, he was not aware that the Washingtons were black. On June 9, 1978, the Washingtons were informed that the townhouse for which they had applied had been rented to someone else.
 
 
 6
 During July 1978, Sherwin Real Estate ran several more newspaper advertisements describing the availability of a townhouse in Evanston. The Washingtons, apparently believing that the townhouse described in the advertisements was the same unit they had been shown on June 1, 1978, called Sherwin Real Estate and were told that a townhouse was available. Actually, the townhouse now advertised as available for rental was located at 731 Dobson Street, next door to the townhouse the plaintiffs had been shown on June 1.
 
 
 7
 On July 21, 1978, the plaintiff William Washington again visited the Sherwin Real Estate office to inquire as to the availability of the townhouse advertised. Leonette Lindwall, a secretary who was present in the Sherwin Real Estate office that day, testified that Mr. Washington acted in a rude and belligerent manner during his visit to the real estate office. Her testimony recited the following:
 
 
 8
 "Q All right. Directing your attention to about the 21st day of July in the year 1978, did you have occasion to observe in your offices the Plaintiff, Mr. William Washington?
 
 
 9
 "A Yes, he walked right into my office, my back office.
 
 
 10
 "Q Is that a private office?
 
 
 11
 "A Yes, it is.
 
 
 12
 "Q All right. Will you describe to the Court what if anything you observed?
 
 
 13
 "A He said he wanted to see an apartment or a townhouse. I don't remember exactly. And I said, 'The gentleman over there on the telephone will help you as soon as he is finished. Could you please wait?' And he went right over to Mr. Oakland's desk and stood over there and--while Mr. Oakland was on the telephone."Q And could you hear anything about the conversation the two of them had?
 
 
 14
 "A Well, I was on the telephone at the time, and I did hear a commotion of--loudness I guess you would call it.
 
 
 15
 "Q Coming from whom?
 
 
 16
 "A Coming from the outer office. And it disturbed me while I was on my phone conversation.
 
 
 17
 "Then after the noise was gone, I walked out and said to Mr. Oakland, 'What was going on here? It was very disturbing to me.' And that was it. And then he just told me about the townhouse."
 
 
 18
 Oakland, a Sherwin Real Estate representative, described the incident as follows:
 
 
 19
 "Q Would you describe your first meeting with Mr. Washington to the Court?
 
 
 20
 "A Well, I was in a phone conversation at my desk, and I seen Mr. Washington come in. I had never seen this man before. And he went by the receptionist into Lee's office, the secretary.
 
 
 21
 "I was still talking on the phone, and I came out and he told me that he wanted to see a townhouse. And I said, 'I will be with you in just a moment.'
 
 
 22
 "Q You were still talking on the telephone, is that correct?
 
 
 23
 "A Yes, and when I finished that conversation I got up and walked over to him and asked him if I could help him. And he said he wanted to see, 'That townhouse.' And I said, 'Which townhouse?' And he said, 'The one in the Evanston Review.' And I said, 'It is rented.'
 
 
 24
 "Q Was there any further conversation at that time?
 
 
 25
 "A Well, he became perturbed and--
 
 
 26
 THE COURT: What did you say?
 
 
 27
 THE WITNESS: Well, it is hard for me, your Honor, to remember exactly all the words.
 
 
 28
 THE COURT: Not the exact words but in substance.
 
 BY MR. SPRAYREGAN:
 
 29
 "Q Would you describe--
 
 
 30
 "A He became--during the conversation he became belligerent and it is hard for me to--
 
 
 31
 "Q Can you give the Court, Mr. Oakland, your best recollection of what he said to you?
 
 
 32
 "A He said at one point that he had to move and he had to move in a hurry.
 
 
 33
 "And I told him if I did have something for him to rent, I couldn't rent to him because it would take maybe a week for a credit check. And then he told me that he was losing too much time from work and he couldn't afford running out there all the time.
 
 
 34
 "And then I offered him my--I figured--I believed that he was interested in townhouses. I had a townhouse at Hibbard Street.
 
 
 35
 "Q In what town?
 
 
 36
 "A In Wilmette, and I offered to show him that, and he said he didn't want it. He didn't want a so-and-so house in Wilmette, he wanted that one in Evanston.
 
 
 37
 "Q Was there any further conversation between the two of you at that time that you recall?
 
 
 38
 "A Well, I remember at one point he asked me the question who the hell I thought I was dealing with, some monkey? He told me he was a bus driver, his wife was in business with himself, and also said that he received money from the government to go to school on.
 
 
 39
 "Q When you offered to show him a townhouse in Wilmette, did he accept that invitation?
 
 
 40
 "A No, he said he didn't want anything in Wilmette.
 
 
 41
 "Q Now, did you form any opinion during the course of this meeting as to whether or not Mr. Washington would make a desirable tenant?
 
 
 42
 "A Well, yes, of course, I am trained to do that.
 
 
 43
 MR. WASHINGTON: Objection, your Honor.
 
 
 44
 THE COURT: He has a right to say what his opinion was as to whether or not he was a desirable tenant.
 
 
 45
 BY THE WITNESS:"A If I did have him asking to rent, I don't think I would rent to him because I think he would be a troublesome tenant or be complaining or--I wasn't impressed at all.
 
 BY MR. SPRAYREGAN:
 
 46
 "Q That was the opinion you formed at that time?
 
 
 47
 "A Yes."
 
 
 48
 Oakland testified that after Washington left the Sherwin Real Estate office, Oakland learned for the first time from his secretary Lindwall that the 731 Dobson Street townhouse had in fact not been rented and was available, contrary to his previous understanding. However, Oakland did not subsequently contact Washington to rent the townhouse because Oakland had reached the conclusion, based on Washington's conduct in the office, that Washington would be a "troublesome tenant" and that it would not be in Sherwin Real Estate's best interest to rent the townhouse to the Washingtons.
 
 
 49
 After the second incident in the Sherwin Real Estate office, Washington concluded that he and his wife were being discriminated against because of their race. The Washingtons contacted the Leadership Council for Metropolitan Open Communities, an organization dedicated to promoting open housing opportunity in the Chicago area, to inform the Council that they believed that Sherwin Real Estate was practicing housing discrimination. In an attempt to investigate the accusations against Sherwin Real Estate, the Leadership Council sent Joan Elbert, a white "tester"[1] to apply for the townhouse. When Elbert contacted Sherwin Real Estate, she was told that the townhouse was available for her inspection. After viewing the townhouse on July 20, 1978, Elbert completed a rental application. Several days later, Sherwin Real Estate accepted her application.
 
 
 50
 On August 1, 1978, the Washingtons filed suit in the federal district court alleging that the defendants had discriminated against the Washingtons on the basis of race in violation of the Civil Rights Act of 1866, 42 U.S.C. Sec. 1982, and the Fair Housing Act of 1968, 42 U.S.C. Sec. 3601 et seq. In their suit, the plaintiffs sought a temporary restraining order and a preliminary injunction to direct the defendants to rent the townhouse to the Washingtons. The plaintiffs also filed a complaint seeking damages, attorneys' fees and costs. On August 4, 1978, the district court issued a preliminary injunction prohibiting the defendants from renting the townhouse to any persons other than the plaintiffs during the pendency of the suit. On the same day, Sherwin Real Estate allowed the Washingtons to rent the townhouse under a one-year lease.
 
 
 51
 The plaintiffs continued to pursue their action for damages against the defendants. During the ensuing months, the parties conducted protracted discovery and both parties moved for orders compelling discovery and for orders imposing sanctions for failure to comply with requests for discovery. These orders were continued by the court awaiting disposition of the case on the merits.
 
 
 52
 On August 17, 1979, Judge Leighton determined the case to be ready for trial and further ordered counsel to be prepared for trial on two-day notice. The suit remained in this posture for over two years until it was transferred to the Honorable J. Sam Perry by order dated August 28, 1981. The case was originally set for trial on December 1, 1982, but was reset for bench trial on January 5, 1982, by stipulation of the parties.
 
 
 53
 On the day of trial, the parties appeared in court with their respective counsel and the defendants' attorney answered ready for trial. However, the Washingtons' lawyer, Cornelius Toole, informed the court that he wished to withdraw as counsel for the plaintiffs because of a "breakdown in communications" with his clients. More specifically, Toole told the court that he had advised his clients to settle the case; initially, the Washingtons apparently heeded his advice and agreed to a settlement with the defendants. Later, the Washingtons changed their minds and, on the day of trial, advised Attorney Toole that in fact they did not wish to settle the case but instead wanted to proceed to trial. Faced with the Washingtons' decision rejecting his advice, Toole, a lawyer with extensive experience in the civil rights field, advised the court that he wished to withdraw.[2]
 
 
 54
 After being advised of the foregoing, the court granted Attorney Toole permission to withdraw and directed the plaintiffs to present their case pro se. The Washingtons did not object to Toole's withdrawal as counsel and did not at this time request a continuance nor in any way object to their being directed to proceed with trial.
 
 
 55
 During the proceedings that morning, Mr. and Mrs. Washington began by giving an opening statement. Mrs. Washington then took the witness stand and answered questions put to her by her husband, after which her husband took the stand and responded to his wife's interrogations. The Washingtons were cross-examined by the defendants' attorney. After the Washingtons' testimony was concluded, Mrs. Washington asked the court for a continuance for an indefinite period in order that the Washingtons could produce the testimony of Elbert, the white tester. The court denied the request for a continuance but recessed for the lunch hour.
 
 
 56
 During the lunch hour, the Washingtons contacted another attorney, George Spataro, who accompanied them to the trial when it resumed after lunch. Spataro informed the court that he would file an appearance on the Washingtons' behalf only if the court granted a continuance to allow him to review the case file, as the Washingtons had contacted him less than half-an-hour earlier, and he had not had an opportunity to familiarize himself with the facts of the case. The request for a continuance was denied, thus Spataro refused to file an appearance and the trial continued.
 
 
 57
 The next morning, January 6, 1982, the Washingtons presented the testimony of Elbert, the Leadership Council tester. After hearing the parties' closing arguments, the district court entered judgment for the defendants, and made the following findings of fact and conclusions of law:
 
 
 58
 "This action having come on for trial before the court without a jury, and the court, having heard the testimony of all of the parties and the argument of plaintiffs pro se and of counsel for defendants, now hereby makes the following findings of fact and conclusions of law herein:
 
 
 59
 "1. The court finds that defendants, Sherwin Real Estate, Inc., an Illinois corporation, Michigan Avenue Bank, an Illinois banking corporation, U/T # 2056, and Sherwin Management, Inc., an Illinois corporation, have a policy of open housing and no discrimination against minorities. The court further finds that at the time complained of in the complaint, the said named defendants followed that policy and that neither they nor their agents refused to rent the premises involved herein to William and Judy Washington because they were black, but, instead, refused to rent the premises to them because of the belligerent conduct of plaintiff William Washington when he appeared at the rental office of defendants.
 
 
 60
 "2. The agents of the defendants and the defendants themselves were justified in forming an opinion that plaintiff William Washington would not be a desirable tenant; and they, therefore, were justified in refusing to rent to the plaintiffs; and they did not discriminate in any manner against plaintiffs.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 "6. The court concludes defendants Sherwin Real Estate, Inc., Michigan Avenue Bank, an Illinois banking corporation, U/T # 2056, and Sherwin Management, Inc. should have judgment against both of the plaintiffs William Washington and Judy Washington."
 
 
 64
 On appeal,[3] the plaintiffs argue that the district court erred in two respects. First, the Washingtons contend that the district court abused its discretion by allowing the Washingtons' attorney to withdraw while at the same time directing the Washingtons to proceed pro se without a recess or continuance. Second, the plaintiffs assert that the district court erred in finding no actionable discrimination under these circumstances. Although we, if acting as trial judges in similar circumstances, may or may not have acted as the trial court did in this case, our role as an appellate court is limited and we accordingly affirm the district court.
 
 ISSUES
 
 65
 Issue 1: Did the district court abuse its discretion by allowing the Washingtons' attorney to withdraw while at the same time directing the Washingtons to proceed pro se without a recess or a continuance?
 
 
 66
 Issue 2: Whether the trial court erred in finding no actionable discrimination?
 
 II.
 
 67
 The first issue as phrased by the plaintiffs, whether the district court abused its discretion by allowing the Washingtons' attorney to withdraw while at the same time directing the Washingtons to proceed pro se without a recess or a continuance, can be logically divided into two separate inquiries. The first inquiry involves the district court's exercise of its discretion in permitting the plaintiff's attorney to withdraw, while the second inquiry raises the question of whether the court abused its discretion by directing the plaintiffs to proceed pro se at trial without benefit of a continuance. These two subissues will be discussed separately.
 
 
 68
 A. ALLOWING THE WASHINGTONS' ATTORNEY TO WITHDRAW.
 
 
 69
 The grant or denial of an attorney's motion to withdraw in a civil case is a matter addressed to the discretion of the trial court and will be reversed on appeal only when the trial court has abused its discretion. Moore v. Sunbeam Corp., 459 F.2d 811, 829 (7th Cir.1972). Under the abuse of discretion standard of review, the relevant inquiry is not "how the reviewing judges would have ruled if they had been considering the case in the first place." Beshear v. Weinzapfel, 474 F.2d 127, 134 (7th Cir.1973). Rather, "an abuse of discretion is established only where no reasonable man could agree with the district court; if reasonable men could differ as to the propriety of the court's action, no abuse of discretion has been shown." Smith v. Widman Trucking & Excavating, 627 F.2d 792, 795-96 (7th Cir.1980); see also Beshear v. Weinzapfel, 474 F.2d 127, 134 (7th Cir.1973). Under the circumstances of this case, we decline to hold that the district court abused its discretion by allowing the plaintiffs' attorney to withdraw from the case.
 
 
 70
 Attorney Toole, the plaintiffs' lawyer, advised the Washingtons to accept the settlement offer tendered by the defendants. Toole, an attorney with extensive experience in discrimination cases, presumably believed that the defendants' offer was fair and that going to trial with the case would not be in his clients' best interest. The Washingtons, however, refused to accept Toole's advice and demanded that the case go to trial. Faced with his clients' rejection of his advice, Toole did not act improperly by seeking the court's permission to withdraw as "[i]n private engagements counsel may withdraw if advice (even to settle) is not followed." Spero v. Abbott Laboratories, 396 F.Supp. 321, 323 (N.D.Ill.1975). In fact, Toole advised the court that communications with his clients had deteriorated to the point that he could not, in good conscience, proceed with the case. Thus, Toole's motion to withdraw was properly granted since where an attorney "feels he will be unable for health reasons or otherwise, to adequately represent his client he has the duty to withdraw from the case." Green v. Forney Engineering Co., 589 F.2d 243, 247-48 (5th Cir.1979).[4] Moreover, it is crucial to point out that the Washingtons, who were present when Toole advised the court of his desire to withdraw, at no time objected to or expressed any disagreement with Attorney Toole's request to withdraw. See Ma v. Community Bank, 494 F.Supp. 252, 260 (E.D.Wis.1980). In fact, in light of the Washingtons' silence, it would have been reasonable for the trial court to conclude that the Washingtons acquiesced in Toole's withdrawal. A finding of abuse of discretion is less likely where the clients do not object to or express any disagreement with their attorney's request for permission to withdraw. Under these circumstances, we decline to hold that the district court abused its discretion by allowing Attorney Toole to withdraw where (1) the Washingtons declined to follow Toole's advice to settle the case, and (2) the Washingtons did not object to or express disagreement with Toole's withdrawal.
 
 
 71
 B. DIRECTING THE WASHINGTONS TO PROCEED WITH TRIAL
 
 
 72
 The plaintiffs next argue that the district court erred by directing them to present their case pro se without benefit of a continuance or recess. We reject this argument and hold that the trial court did not abuse its discretion by directing the plaintiffs to proceed pro se with their case.
 
 
 73
 In Grunewald v. Missouri Pacific Railroad Co., 331 F.2d 983 (8th Cir.1964), the plaintiff argued that the district court erred by denying the plaintiff's motion for a continuance and dismissing the case for failure to prosecute. On appeal, the Eighth Circuit affirmed and, Judge Blackmun, now Justice Blackmun, writing for the court noted:
 
 
 74
 "It is equally well settled ... that in a civil case an attorney's withdrawal does not give his client an absolute right to a continuance. This, too, is a matter for the court's discretion.... [A] trial court's refusal to grant a continuance will not be disturbed on appeal unless abuse of discretion is demonstrated.
 
 
 75
 * * *
 
 
 76
 * * *
 
 
 77
 "The standard we must apply, however, as indicated above, is not what we as individual judges might have done under the circumstances, but whether the district court's action was an abuse of its discretion. We cannot so conclude."
 
 
 78
 Id. at 986-87. It is important to note that in Grunewald the Eighth Circuit held that the district court, when presented with an attorney's last-minute withdrawal, did not abuse its discretion by denying a continuance and dismissing the action for failure to prosecute. In the instant case, on the other hand, the plaintiffs ask us to find that the district court abused its discretion by taking the far less drastic course of directing the Washingtons to proceed pro se, where no request for a continuance was made until almost half-way through the trial. We decline to find an abuse of discretion under these circumstances.
 
 
 79
 Several key factors support the conclusion that the district court acted within the scope of its discretion in directing the Washingtons to proceed to trial pro se. First, at the time of trial, the case had been pending for over three years and had been set for trial on two-day notice for over two years. In light of the protracted nature of the litigation and the overloaded calendars of the federal court system, combined with the fact that this case had been pending for over three years, it was not unreasonable for the district court to conclude that no further delay could be tolerated and that the trial must proceed. See Grunewald, 331 F.2d at 987.
 
 
 80
 Second, the defendants' attorney and four defense witnesses appeared in court ready to proceed with trial. We must remember that the rights of the defendants must be considered and weighed with the plaintiffs' rights in situations such as this. Certainly, the defendants, as well as the plaintiffs, had expended considerable time and expense in preparing for trial and thus it would have been unduly inconvenient to the defendants and to the trial judge if a continuance had been granted on the day of trial. Additionally, allowing a continuance at such short notice would have impeded the efficient operation of our courts as it would have been almost impossible for the court to have substituted another case for trial that same day. One of the greatest criticisms directed at the judicial system is the long delay in bringing cases to trial, and every effort should be made to expedite cases, consistent with the rights of litigants.
 
 
 81
 Third, our review of the record reveals numerous instances in which the trial judge relaxed the formal rules of procedure and evidence to aid the plaintiffs in presenting their case. Because this was a bench trial rather than a jury trial, the trial judge was able to go out of his way to aid the plaintiffs in presenting their case without prejudicing the trial and thus minimize the risk of prejudicial error.
 
 
 82
 Finally, the Washingtons did not object to being directed to proceed pro se nor did they request a continuance until nearly half-way through the trial. Even then, Mrs. Washington only requested a continuance for the purpose of securing the testimony of Elbert, the white tester. Although this request was denied at the particular time, the Washingtons were allowed to present Elbert's testimony the following day. Furthermore, Attorney Spataro's request for a continuance was properly denied by the district court as Spataro refused even to enter an appearance on behalf of the Washingtons due to his unfamiliarity with the case.
 
 
 83
 We hold that, under the totality of the circumstances, the district court did not abuse its discretion by allowing the Washingtons' attorney to withdraw and directing the Washingtons to present their case pro se. While we as individual judges may or may not have acted differently under these circumstances, we find no abuse of discretion as we cannot say in this case that "no reasonable man could agree with the district court." Widman Trucking, 627 F.2d at 795-96.
 
 III.
 
 84
 The Washingtons next argue that the trial court erred in finding no actionable discrimination in this case. More specifically, the plaintiffs attack as inadequate and clearly erroneous the trial court's finding that the defendants did not refuse:
 
 
 85
 "to rent the premises involved herein to William and Judy Washington because they were black, but, instead, refused to rent the premises to them because of the belligerent conduct of plaintiff William Washington when he appeared at the rental office of defendants."
 
 
 86
 Title VIII of the Civil Rights Act of 1968 provides in pertinent part:
 
 
 87
 "[I]t shall be unlawful--
 
 
 88
 "(d) To represent to any person because of race ... that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available."
 
 
 89
 42 U.S.C. Sec. 3604 (emphasis added). Thus, to establish a cause of action under Title VIII, a party must prove that he or she was discriminated against because of race.[5] While we recognize that subjective reasons for refusing to rent to minority homeseekers are subject to close judicial scrutiny, Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1040-41 (2nd Cir.1979), we hold that in this case the district court's finding that the Washingtons were not denied housing because of race is not clearly erroneous, as it is clear that the trial court credited Oakland's testimony that the Washingtons were denied an apartment because Oakland believed they would be undesirable tenants on the basis of Mr. Washington's rude and belligerent behavior in the real estate office.
 
 
 90
 The case of Hamilton v. Miller, 477 F.2d 908 (10th Cir.1973) is particularly relevant to the instant case. In Hamilton, the plaintiff, a black student, was told by the defendant landlord that an apartment that had been advertised as available for rental had already been rented. The following day, the defendant told a white "tester" that the apartment was still available. Later, on two separate occasions, the plaintiff was again told by the defendant that the apartment was not available. The plaintiff brought suit alleging racial discrimination, but the defendant successfully defended at trial on the basis that the plaintiff had been denied housing because the defendant had concluded that, based on the plaintiff's belligerent behavior, that he would be an undesirable tenant. On appeal, the plaintiff argued that the trial court's finding of no actionable discrimination was clearly erroneous. The Tenth Circuit rejected this argument, affirmed the district court and held as follows:
 
 
 91
 "Concerning the two following incidents when Hamilton was told there was no apartment available defense witnesses testified that Hamilton was extremely aggressive, demanding that the apartment be rented to him. Miller testified that plaintiff's attitude and mannerisms led him to believe that Hamilton would be a troublesome tenant and that was the sole reason for his rejection. Miller stated, in effect, that he did not wish to personalize the rejection but preferred to deny the availability of the apartment. Miller's testimony was fully credited by the trial court and premises the remaining findings that formed the judgment below. Again, we cannot disturb the findings as a matter of law.
 
 
 92
 "As in any case where a determination of credibility dictates a result the chance of an injustice is ever present. But we cannot, as we are here urged in effect to do, try the case de novo. Such is not the function of an appellate court. The resolution of conflicting evidence, as exists in this case, is particularly within the province of the trial court and findings must be given added weight when we consider the opportunity of the trial judge to hear and observe the witnesses."
 
 
 93
 Id. at 910.
 
 
 94
 The reasoning which guided the Tenth Circuit in Hamilton governs the result in the instant case. An appellate court's function is limited. It is the trial court's function to hear and observe the witnesses and to weigh the conflicting evidence. On appeal, we are not to decide a case based on what we, as individual judges, would have decided under the same or similar circumstances. Rather, we must accept the findings of the trial court unless those findings are clearly erroneous. Based on our review of the record, we hold that the district court's finding of no actionable discrimination is not clearly erroneous.
 
 CONCLUSION
 
 95
 Based on the foregoing, we hold that: (1) under these circumstances the district court did not abuse its discretion by allowing the plaintiffs' attorney to withdraw and directing the plaintiffs to proceed pro se; and (2) the district court's finding of no actionable discrimination is not clearly erroneous. Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Edward Dumbauld, Senior Judge of the United States District Court, Western District of Pennsylvania, is sitting by designation
 
 
 [1]
 A "tester" is an individual who applies for an apartment, not with the desire to actually rent the apartment but instead for the purpose of proving discrimination. Discrimination is more easily shown where a landlord who has previously advised a minority applicant that the apartment is rented, later accepts a white "tester's" application
 
 
 [2]
 Attorney Toole advised the court as follows:
 "MR. TOOLE: Judge, I was instructed to advise the Court that the case was settled, and I advised Mr. Sprayregan of that and when the client came into the courtroom he changed his mind and indicated that he didn't want that settlement.
 "I don't feel that I can in good conscience proceed in this matter, and I am going to ask for permission to withdraw. There has been a breakdown in communications."
 
 
 [3]
 On appeal, the Washingtons are represented by an attorney
 
 
 [4]
 This is not to say, of course, that Attorney Toole would have acted improperly had he not sought permission to withdraw. An attorney is not compelled to withdraw if his or her client refuses proffered advice. See Model Code of Professional Responsibility EC 7-5 (1979)
 
 
 [5]
 Contrary to the plaintiffs' contention, Haven Realty Corp. v. Coleman, --- U.S. ----, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), does not create a categorical "right to truthful information about available housing." Rather, Coleman, consistent with the plain language of Sec. 3604, states that it is unlawful to misrepresent, on the basis of race, that housing is unavailable