**In re MERCURY FINANCE COMPANY, a Delaware Corporation, Debtor.**

**No. 98 B 20763.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 13, 2000.

Samuel D. Heins, Stacey L. Mills, Bryan L. Crawford, Heins, Mills & Olson, P.L.C., Minneapolis, MN, Fay Clayton, Robert L. Margolis, Robinson, Curley & Clayton Chicago, IL, Lowell Sachnoff, David Bohan, Sachnoff & Weaver Ltd., Chicago, IL, for Federal Class.

Clinton Krislov, Krislov & Associates, Ltd., Chicago, IL, for State Class.

I. Walton Bader, Bader & Bader, White Plaines, NY, for Shriners Hospital for Children.

Suzanne McCarthy, New York City, for ERISA Class.

Stewart M. Weltman, Stewart, Weltman & Associates, Chicago, IL, Arthur T. Susman, Charles R. Watkins, Susman & Watkins, Chicago, IL, Lawerence Walner, Walner & Assoc., Chicago, IL, William Prickett, Ronald A. Brown, Jr., Prickett, Jones, Elliott & Kristol, Wilmington, DE, William J. Harte, Chicago, IL, for Holder Class.

Honorable Nicholas J. Bua Burke, Weaver & Prell, Chicago, IL, Arbitrator.

Daniel A. Pollack, Martin T. Kaminsky, Edward T. McDermott, Anthony Zaccaria, Pollack & Kaminsky, New York City, for T. Rowe Price.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on appeal from the award of arbitrator Nicholas J. Bua regarding the claims of various claimants who are members of Class 7B as defined in Mercury Finance Company's plan of reorganization, filed and approved under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (hereinafter the "Code"). For the reasons that follow, the award is affirmed.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 9 U.S.C. § 9, 28 U.S.C. § 157(b) and 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28

U.S.C. § 157(b)(2)(A), (B), (L), and (O). Venue lies under 28 U.S.C. § 1409.

## BACKGROUND

Mercury Finance Company ("Mercury") was a consumer finance company in the business of acquiring installment sales finance contracts from automobile dealers and retail vendors, extending short-term installment loans directly to consumers, and selling credit insurance and other related products. It was primarily in the business of making sub-prime auto loans. It provided high-interest financing to high-risk borrowers.

Mercury operated through a series of thirty-seven wholly-owned subsidiaries (the "Subsidiaries"), each of which was separately incorporated. The Subsidiaries made loans through 287 operating branches located in twenty-seven states. Mercury was, in essence, a holding or parent company. The proceeds of the operations of the Subsidiaries were swept on a daily basis into a Mercury bank account set up for that purpose.

Mercury was first organized in 1988 and its stock was first publicly traded in 1989. John Brincat ("Brincat") was Mercury's Chief Executive Officer ("CEO") and James A. Doyle ("Doyle") was the Chief Financial Officer ("CFO").

In early January 1997, Mercury's stock was publicly regarded as a hot growth stock and was trading at approximately $15–$16 per share. In late January of 1997, Mercury announced that it had overstated its 1995 and 1996 earnings by $186.5 million. It later turned out that Mercury had significantly overstated its earnings for at least four years.

Following this announcement, Mercury's stock price immediately dropped to about two dollars per share. By December 1997, the stock was worth less than a dollar a share. Mercury defaulted on more than $1.1 billion dollars in debt and its shareholders lost more than $2.5 billion in total.

Mercury publicly blamed Doyle for "cooking the books." The FBI and the U.S. Attorney began investigating Doyle, who subsequently cooperated with them and was expected to be a primary witness in any government case against Mercury and Brincat. However, in June 1997, Doyle died from a heart attack. Brincat stepped down as CEO in February 1997, but retained a seat on Mercury's board. He resigned as a director effective December 1, 1997.

During 1997 and 1998, Mercury became the target of SEC investigations and securities fraud litigation arising largely from its announcement that it had overstated earnings. As of December 30, 1998, forty-five actions had been filed against Mercury, its officers and directors including Doyle and Brincat, and its auditor, KPMG Peat Marwick ("KPMG"), in the United States District Court for the Northern District of Illinois, six cases had been filed in Illinois Chancery Court, and nine cases were filed in Delaware Chancery Court. The complaints sought compensatory damages, attorneys' fees, and costs in excess of $2 billion. Forty-one of these lawsuits were class actions.

Thirty-nine of the cases pending in the Northern District of Illinois were consolidated on April 30, 1997 before Judge Charles R. Norgle, Sr. Seven of these cases were dismissed in 1998. The Minnesota State Board of Investment was appointed lead plaintiff in the federal class actions. Magistrate Judge Edward A. Bobrick conducted a number of settlement sessions which structured the adversarial parties into groups with lead counsel representation and had proposed several outlines for procedural settlement.

Before the parties arrived at any settlement, on July 6, 1998, several creditors filed an involuntary proceeding against Mercury under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Mercury did not consent but followed by filing its own voluntary petition under Chapter 11 on July 15, 1998. This Court consoli-

dated the two proceedings and entered an order for relief on July 15, 1998.

Early in the proceeding, it was argued that the Subsidiaries were not debtors and that they therefore did not require court's permission to utilize their cash. Mercury adopted a cautious approach and requested court approval. The Court opined that the practice of sweeping the cash surely brought the funds within the jurisdiction of the Court, but was quick to authorize its continuation. The Court also permitted Mercury, under the doctrine of necessity, to continue to pay trade creditors and various other prepetition and post-petition accounts on a current basis so that all the Subsidiaries could continue operations. These moves were supported by the creditor body and the United States Trustee's (the "UST") office. The only creditors impacted by the reorganization process were, therefore, noteholders, holders of equity interests and options, and those holding securities fraud claims.

The UST formed two committees. The first consisted solely of unsecured creditors. The second consisted of both creditors who had formerly held Mercury stock and current equity security holders. Several equity security holders who were not appointed to the committee objected to the mixed committee membership. They brought an emergency motion to resolve the question of which claimants could properly be included in the Committee of Equity Holders and Security Purchasers (the "Combined Committee"). The Court issued an oral ruling dissolving the Combined Committee on August 19, 1998, followed by a memorandum opinion issued August 24, 1998 and a Supplemental Opinion Denying Motion to Reconsider on August 28, 1998, *In re Mercury Finance Co.*, 224 B.R. 380 (Bankr.N.D.Ill.1998), *aff'd* 240 B.R. 270 (N.D.Ill.1999). The Court held that it had authority under 11 U.S.C. § 105(a) to review the UST's appointment of the Combined Committee. It then dissolved the Combined Committee because no statutory authority existed for the appointment of a mixed committee and denied the UST's motion for reconsideration, stating that "there is no statutory authority for a blended committee consisting of creditors and equity holders even as an 'additional committee.' The U.S. Trustee has no power to appoint such a mixed committee under [11 U.S.C. §] 1102(a)." *Id.* at 388. On August 31, 1998, the Court ordered the UST to appoint a comprised of equity security holders and an additional committee of creditors holding claims arising from the purchase or sale of Mercury stock.

Negotiations continued and Mercury was ultimately able to present a consensual plan of reorganization which included settlement of the securities claims against Mercury and its directors and officers. The Shriners Hospitals for Children (the "Shriners"), a purchaser and seller of Mercury stock questioned the Court's jurisdiction over its claims. This Court then recommended that it hold joint hearings with the District Court. The District Court and the Bankruptcy Court held a joint session wherein the District Court ruled on class certification and settlement and the Bankruptcy Court ruled on the disclosure statement and the plan of reorganization (the "Plan"). The heart of the Plan was the settlement of the securities fraud cases. The Plan placed the various securities fraud claimants, both classes and individuals, into one bankruptcy plan class, Class 7B. Class 7B has six member entities, four of which are class actions.

The term "class" has two meanings in this opinion. It may refer to class actions where a group or groups of plaintiffs, either certified by a federal court or seeking such certification to proceed as a group against named defendants, seek redress for a common injury. The term "class" also refers to a group of claims or interests that the drafter of a bankruptcy plan has placed together based on substantial similarity of those claims or interests. 11 U.S.C. § 1122(a). Class 7B is a class of the latter type, although many of the

claims and interests placed within it belong to different class actions. The members of a given class action may not be adverse to one another's interests; the members of a bankruptcy plan class may be, and in this case, are.

The Plan, in conjunction with the Class 7B Liquidating Trust Agreement (the "Trust Agreement"), provided that Mercury would transfer $5 million to the Class 7B Liquidating Trust (the "Trust") established to pay the securities fraud claimants. Mercury also transferred its claims against KPMG and $250,000 to cover fees and costs connected with trust administration. In exchange, the Class 7B claimants were enjoined from further pursuing claims against Mercury or the settling individual defendants. The Trust's assets (the "Trust Assets") presently amount to approximately $30 million. Most of the money comes from settlements with defendants other than Mercury, such as Mercury's officers and directors.

These Trust Assets are not nearly enough to pay the more than two billion dollars in claims against the Trust made by the members of Class 7B. The Plan and the Trust Agreement created a mechanism for determining the validity of the claims to the Trust Assets and dividing the Trust Assets among the six competing claims to them. No claimant in Class 7B can possibly recover more than pennies on the dollar. This would be true even if only one of the six claimants to the Trust Assets were to receive all the Trust Assets.

The Trust Agreement, entered into pursuant to and concurrently with the Plan, provided for a period of negotiation during which the claimants under Class 7B could attempt to negotiate a consensual allowance of claims and allocation of the Trust's assets. In other words, it was drafted in the hope that the six claimants would be able to agree to divide the $30 million among themselves. It further provided

that if the parties could not reach agreement by May 14, 1999, then the parties would proceed to arbitration, where an arbitrator would make the division for them.

By the class action notice, the individual members of the four class actions were notified that prior to distribution to individual members of a class, the Trust Assets would be allocated among the six claimants in Class 7B. (Notice of Pendency of Class Action, Proposed Partial Settlement of Class Action, and Settlement Hearing § III(A)(iii)). They were further notified that counsel for the lead plaintiff in each class action would then distribute that class action's share of the Trust Assets among that class action's members under the supervision of the District Court. (Notice of Pendency of Class Action § III(A)(iii)). The class action members were notified that each individual's actual share would be dependent upon the allocation of the Trust Assets and other factors, such as the timing of each individual's transactions in Mercury stock and the number of class action members who submitted proper claims. (Notice of Pendency of Class Action § III(A)(iii)). The costs of prosecuting each action and the fees of the attorneys for each class will be deducted from the sum allocated to each class before any distribution is made to any individual class member. (Notice of Pendency of Class Action § III(A)(iii)).

The possibility that the claims in Class 7B would receive unequal treatment concerned the Court; Section 1123(a)(4) provides that each claim or interest within the same class under a bankruptcy plan must receive the same treatment, absent consent to less favorable treatment. On April 5, 2000, the Court convened a hearing on this question, at which all parties stipulated that they did so consent and that their consent was implicit in the Plan and Trust Agreement.[1]

1. The ERISA Class was not present at the hearing, but subsequently submitted written

consent to the Court.

The six members of Class 7B were unable to reach any agreement under the Plan and Trust Agreement. The trustees of the Trust (the Trustees) selected retired United States District Judge Nicholas J. Bua (the "Arbitrator") as arbitrator. Under the terms of the Plan and Trust Agreement, the arbitration is binding and the Arbitrator's decision and award may be vacated or modified only if: (1) the Arbitrator was not a neutral party; (2) the award was obtained by fraud; or (3) the Arbitrator abused his discretion or violated public policy. Any application to vacate or modify the Arbitrator's award must be made to this Court.

The six competing claimants to the Trust Assets are: (1) the Federal Class Claimants (the "Federal Class"); (2) the State Class Claimants (the "State Class"); (3); the ERISA Class Claimants (the "ERISA Class"); (4) the Shriners Hospitals for Children (the "Shriners"); (5) T. Rowe Price; and (6) the Holder Class Claimants (the "Holder Class").

The Federal Class is composed of the group of consolidated federal class action claimants for whom the Minnesota State Board of Investments was appointed lead plaintiff by the District Court. This group is comprised of purchasers of 100,023,484 shares of Mercury stock claiming damages in the range of $1.082 billion to $1.409 billion. It argues that it is entitled to all of the Trust's assets.

The State Class asserted state-law claims against Mercury in Cook County Circuit Court and claims damages exceeding $1 billion based on the purchase of one hundred million shares of Mercury stock.

The ERISA Class are current and former Mercury employees who purchased Mercury stock through the company's retirement plan. These purchases were made both before and during the period of Mercury's earnings overstatements. The ERISA Class claims damages greater than $10 million, based on Mercury's breach of fiduciary duty. The ERISA Class did not provide information sufficient to allow the Arbitrator to determine whether its members were current equity holders or creditors who purchased and sold Mercury stock.

The Shriners, not part of any class action, purchased more than 2 million shares of Mercury stock between October 1, 1995 and January 29, 1997; it claims damages in excess of $13 million.

T. Rowe Price is also an individual plaintiff. It claims damages of $75 million for the purchase of 7.5 million shares of Mercury stock between September 27, 1996 and January 9, 1997.

The Holder Class consists of those persons and entities who purchased Mercury stock prior to February 23, 1994, but who held the stock through January 29, 1997, the date on which Mercury announced it had overstated earnings. Based on state law claims for breach of fiduciary duty and fraud, it seeks more than $1 billion for sixty-eight million shares held during that period.

The parties submitted briefs in support of their own claims and objections to the claims of the other claimants to the Arbitrator. On November 17 and 18, 1999, the Arbitrator heard evidence and oral arguments. On December 7, 1999, the Arbitrator issued an Award (the "Award") in which he allocated 1.5% of the Trust assets to the Shriners, 4.5% of the Trust assets to T. Rowe Price, 0% to the ERISA Class,[2] 42% to the Federal Class, 10% to the State Class, and 42% to the Holder Class.

The Federal Class and T. Rowe Price each filed a notice of appeal and moved to vacate or modify the Award based on the Arbitrator's abuse of discretion. The Federal Class claims that any allowance of and

---

**2.** The Arbitrator held that the ERISA Class members were eligible to "participate in the settlement funds, but ... that they must do so by submitting appropriately documented proofs of claim as part of the class settlement procedure applicable to purchasers or holders as the case may be." (Award p. 10).

allocation to the Holder Class is an abuse of discretion. T. Rowe Price agrees with the Federal Class as to the Holder Class and also claims that any allowance of the State Class claim is an abuse of discretion. T. Rowe Price further objects to the percentage of the Trust assets allocated to each allowed claim. The Holder Class has moved to dismiss the appeals.

## STANDARD OF REVIEW

Judicial review of arbitration awards is tightly limited. *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir.1994). Arbitral awards carry a presumption of validity. *Flexible Mfg. Systems Pty. Ltd. v. Super Products Corp.*, 86 F.3d 96, 100 (7th Cir.1996). Any reasonable doubts must be resolved in favor of enforcing an arbitral award. *Arch of Illinois, a Division of Apogee Coal Corp. v. District 12, United Mine Workers of America*, 85 F.3d 1289, 1292 (7th Cir. 1996). In cases covered by the Federal Arbitration Act (the "FAA"), vacation of an arbitrator's award is restricted to those instances:

> (1) Where the award was procured by corruption, fraud, or undue means.
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. 10(a). The parties agree that this case is covered by the FAA.

Arbitration is valuable as a quick, cheap way to resolve a dispute. *Wi-*

*dell v. Wolf*, 43 F.3d 1150, 1151 (7th Cir. 1994). It is neither a qualifying round for ongoing litigation nor a way to test the waters. *See Nat'l Wrecking Co. v. Int'l Brotherhood of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir.1993) (stating that "[a]rbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party"). Ongoing litigation defeats the purpose of achieving a speedy and inexpensive resolution. *Widell*, 43 F.3d at 1151. When parties agree to arbitrate, they agree to accept the arbitrator's decision rather than that of a judge. *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). Arbitration is intended to be the final resolution of the dispute. *Nat'l Wrecking*, 990 F.2d at 960. "Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers*, 484 U.S. at 38, 108 S.Ct. 364.

However, parties to an agreement to arbitrate may bargain for and specify any terms they wish to govern the resolution of their dispute. *Mastrobuono v. Shearson, Lehman, Hutton, Inc.*, 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Baravati*, 28 F.3d at 709. The Trust Agreement specifies that "the only grounds of any application to vacate or modify any decision or award of the Arbitrator shall be that the Arbitrator was other than a neutral party, that the award was obtained by fraud, or that the award constituted an abuse of discretion or violated public policy." (Trust Agreement § 6.03(b)(i)). Thus, while a court typically reviews an arbitrator's award to determine whether the arbitrator exceeded or imperfectly executed his powers, the parties have by contract removed those grounds from the scope of the Court's review.

The appellants do not claim that the Arbitrator was biased or partisan. They do not claim that the award was obtained by fraud or that it is contrary to public

policy. Under the terms of the Trust Agreement, the only remaining ground for vacation or modification of the Award is that the Arbitrator abused his discretion.

█ The Court's research has not disclosed any published opinions reviewing an arbitrator's award for abuse of discretion. Nor have the parties referred the Court's attention to any such cases. Usually, abuse of discretion is one standard under which an appellate court reviews the decisions of a lower court. Thus, under the terms of the Trust Agreement, the parties ask this Court to review the Award as an appellate court would review the decision of a lower court.

█ Under the abuse of discretion standard, the decision under review must stand if any reasonable person could agree with it. *Hastert v. Illinois State Board of Election Commissioners*, 28 F.3d 1430, 1440 (7th Cir.1994) citing *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087 (7th Cir.1982), *cert. denied*, 513 U.S. 964, 115 S.Ct. 426, 130 L.Ed.2d 340 (1994). The reviewing court may not reverse the decision merely because it disagrees or would have arrived at a different outcome. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984). A review under the abuse of discretion standard is not a *de novo* review. Under the abuse of discretion standard, a decision-maker abuses its discretion when it bases its decision on an erroneous conclusion of law, where the record contains no evidence to support the decision, or where the facts are clearly erroneous as found. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); *Deitchman*, 740 F.2d at 563–64. When the decision-maker overlooks, "either intentionally or inadvertently, relevant, binding precedent, its decision cannot stand." *Hastert*, 28 F.3d at 1440.

Thus, despite the strong federal policy favoring the finality of arbitration, strictly limiting judicial review of arbitral awards, and prohibiting review for errors of law or fact, the parties have contracted for the same level of review they would have received had they proceeded to trial on the issues. Although the Trust Agreement provides that the arbitration will be binding, it opens the door to judicial review for errors of law and fact. Far from being final arbitration, it is merely an added, entry level tier to the federal court system. The Trust Agreement's terms ensured that the arbitration would not be a final resolution, but rather an expensive and time-consuming qualifying round. Although it is generally well established that courts cannot review an arbitral award for errors of law or fact, that is precisely what this Court now must do. This Court will therefore review the Arbitrator's Award for abuse of discretion.

Even if the Court were to apply the standards of review set forth in the FAA, it would arrive at the conclusion set forth below. The Arbitrator neither exceeded nor imperfectly executed his powers. As fully explained in the following discussion, the Arbitrator performed his duties in a manner consistent with his assignment.

## DISCUSSION

The Federal Class and T. Rowe Price argue that the Arbitrator abused his discretion in two ways. First, they argue that the Arbitrator failed to perform his duties because he did not fully adjudicate the merits of the parties' claims and thus, did not properly allow those claims. Secondly, they argue that any award to the Holder Class is an abuse of discretion because such an award is contrary to well-established law.

### The Arbitrator's Duties

█ To determine whether the Arbitrator properly performed his duties, it is necessary to determine what those duties were. An arbitrator's authority is created by the contract to arbitrate and limited only by that contract and the issues submitted for arbitration. *American Postal Workers Union, AFL–CIO, Milwaukee Local v. Runyon*, 185 F.3d 832,

836 (7th Cir.1999). The arbitration process is not a judicial process; it is "an alternative to judicial dispute resolution, not an echo of it." *Ethyl Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 768 F.2d 180, 183 (7th Cir.1985).

The Plan and the Trust Agreement each provide that the Arbitrator is "to serve in connection with allowance of Class 7B Claims and the allocation of the Trust Assets among the various classes of claimants represented in class actions which were pending against [Mercury] on the Petition Date and other holders of Allowed Claims in Class 7B." (Plan § 8.15; Trust Agreement § 6.02). Thus, the Arbitrator's duties were those of (a) allowance and (b) allocation. However, none of the documents that controlled the Arbitration set forth the standards that the Arbitrator was to apply in allowing claims or the methods to be employed.

The Plan empowered the Trustees to "[d]evise, implement, supervise, modify, and administer procedures for the allowance of Class 7B Claims and the allocation of the assets of the Class 7B Liquidating Trust among the holders of Allowed Class 7B Claims, subject to the limitations imposed by [the] Class 7B Liquidating Trust Agreement or the Plan." (Plan § 8.15). The Plan defines an "Allowed Class 7B Claim" as one "which is allowed in accordance with the ... arbitration procedures set forth in Section 8.15 [of the Plan] and in the Class 7B Liquidating Trust." (Plan § 1(A)). Allowed Class 7B Claims were expressly excepted from all other "Allowed Claims," a term defined in the Plan. The Plan provides that only claims defined as "Allowed Claims" were to be determined in accordance with the provisions of the Bankruptcy Code. (Plan § 1(A)). The "Allowed Claims" definition states that "Claims in Class 7B ... shall be liquidated and allowed in accordance with the procedures substantially to those set forth in [the Trust Agreement]." (Plan § 1(A)). The absence of any reference to the Bankruptcy Code in the immediately-following "Allowed Class 7B Claims" definition raises the inference that something very different was contemplated for the Class 7B Claims.

The Plan provided a procedure and time frame for the submission of claims by claimants to the Trust assets as "Requests for Allowance," accompanied by evidence sufficient to allow the Arbitrator to "determine the basis for an award with respect to allowance and/or allocation of the Class 7B Claims contained in such class." (Plan ¶ 8.15). Filing a Request for Allowance was not to result in an automatic allowance of the claim. (Plan ¶ 8.15). The Requests for Allowance were subject to objections and the "allowance and allocation process in accordance with the procedures established by the Trustees." (Plan § 8.15). The Arbitrator was appointed to serve "in connection with allowance of Class 7B Claims and the allocation of the Trust Assets among the various classes of claimants represented in class actions which were pending against [Mercury] on the Petition Date and other holders of Allowed Claims in Class 7B." (Plan § 8.15). The Arbitrator was empowered to establish rules for the Arbitration to the extent that the Trustees had not done so. (Plan § 8.15).

The purpose of the Trust was to "implement the Plan's treatment of the Class 7B Claims as fairly and expeditiously as possible." (Trust § 2.02). In all respects relating to the Arbitration, the Trust Agreement's language tracks that of the Plan word for word. Thus, a procedural mechanism is defined. Neither the Plan nor the Trust Agreement sets forth the standard by which the Arbitrator would allow the Class 7B Claims.

The Trustees developed a Statement of Arbitration Procedures for Class 7B Settlement Fund Allocation (the "Procedures"). The Procedures identify the Arbitrator, instruct the claimants to the fund (the "Claimants") to submit briefs in support of their own claims, allow the Claimants to submit additional briefs objecting

to the claims of others, and set a briefing and discovery schedule. The Procedures also provided for hearing dates. The Procedures provided that "no materials submitted to the Arbitrator other than as set forth in [the Procedures] shall be considered by the Arbitrator." (Procedures § 6).

Under the section heading "The Hearing," the Procedures state that "[t]he Arbitration will be conducted in accordance with the Arbitration Rules of the Commercial Dispute Resolution Procedures issued by the American Arbitration Association (effective January 1, 1999) to the extent not otherwise provided for in [the Procedures]." (Procedures § 4). The Arbitration Rules of the Commercial Dispute Resolution Procedures issued by the American Arbitration Association (the "AAA Rules") do not set legal standards, but allow an arbitrator to "grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties...." (AAA Rule R–45(a)).

In short, none of the controlling documents, the Plan, the Trust Agreement, the Procedures, or the AAA Rules, set specific standards by which the Arbitrator was to allow the Class 7B Claims. While the Plan plainly makes the Bankruptcy Code applicable to the allowance of all claims other than Class 7B Claims (Plan § 1(A)), it just as plainly excepts Class 7B from the other claims (Plan § 1(A)). The only instructions given by the Plan are that the Class 7B Claims should be allowed in accordance with Plan § 8.15 and the Trust Agreement. The Plan and the Trust Agreement refer to the Procedures, and the Procedures refer to the AAA Rules. The AAA Rules require that the Arbitrator deem the award just and equitable and within the scope of the parties' agreement. The AAA Rules set the only standard by which the Arbitrator in this case was required to measure. Thus the ultimate question is whether, applying the abuse of discretion standard of review, a reasonable person could agree that the Arbitrator made an award that he deemed just and equitable and within the scope of the parties' agreement.

The Arbitrator made an award that he described as "simple, fair, [and] economical." (Award p. 9). As demonstrated, the Award is "just and equitable."

### The Arbitrator Allowed the Claims of the Holder Class and the State Class

The appellants argue that the Arbitrator impermissibly "assumed" the validity of the six claimants' claims, the Holder Class' claim in particular, rather than determining their validity under the Plan and Trust Agreement. (Notice of Appeal by Federal Class Claimants ¶ 1). While the Arbitrator did not discuss the claim allowances at any great length in the Award, the language of the Award clearly shows that he considered objections to the Holder Class claim and that he disagreed with them. In the opening paragraphs of the Award, the Arbitrator states that he "considered a wide variety of materials submitted by the parties." (Award p. 2). Those materials included the objections of both the Federal Class and T. Rowe Price to the Holder Class and State Class claims. That the Arbitrator reviewed the appellants' objections to the other claimants' claims and subsequently awarded a portion of the Trust Assets to those other claimants merely indicates that he disagreed with the appellants' objections, not that he failed to consider them.

The Arbitrator reasoned that although the claim may be "novel or difficult to prove," (Award p. 9), "the members of the Holder Class appear to have claims against the defendants for breach of fiduciary duty." (Award p. 9). He then concluded that the Holder Class claims would have had "substantial settlement value." (Award p. 9). This is not a mere assumption that the claim has validity; it is a determination of that validity. The explanation is brief, but the AAA Rules do not require that an Arbitrator present a detailed, reasoned award. (AAA Rule R–44(b)). This is the Arbitrator's specific

finding that the claim of the Holder Class is allowed.

T. Rowe Price has also objected that the Arbitrator merely assumed, and did not properly allow, the State Class claims. As with the appeal of the allowance of the Holder Class claims, the argument is contradicted by the language of the Award. The Arbitrator wrote that the State Class claims were similar to both the Federal Class and Holder Class Claims, both of which he had already allowed. (Award p. 9). He reasoned that this similarity was reason to allocate a substantially smaller portion of the Trust assets to the State Class, but was not a reason to disallow its claims. (Award p. 9).

A reasonable person could agree with the Arbitrator's explanation. There is no reason to conclude that the Arbitrator abused his discretion in allowing the claims. He did not make any clear errors of fact or law. That portion of the Award allowing the claims is just and equitable and within the scope of the parties' agreement.

### The Arbitrator Properly Allocated Among the Claims

The Arbitrator stated that he did not fully adjudicate the merits of the Claimants' claims. If he had been conducting a trial, the Federal Class and T. Rowe Price would have had grounds for complaint. However, the Arbitrator was not conducting a trial; he was allocating a grossly insufficient settlement fund among competing claimants in an arbitration. The purpose of a settlement is to avoid a trial or full adjudication on the merits. *Curtiss–Wright Corp. v. Helfand*, 687 F.2d 171, 174 (7th Cir.1982). *See also, Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1149 (8th Cir.1999) (recognizing that the purpose of a settlement is to avoid the expense and delay of a trial); *Handschu v. Special Services Div.*, 787 F.2d 828, 834 (2d Cir. 1986) (approving the district court's court's conclusion that "it would be inconsistent with the salutary purposes of settlement to conduct a full trial in order to avoid one")

*Id.; Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983) (explaining that a court faced with a proposed settlement must not try the case in settlement hearings).

 "[T]he allocation of an inadequate fund among competing complainants is a traditional equitable function-using 'equity' to denote not a particular type of remedy, procedure, or jurisdiction but a mode of judgment based on broad equitable principles rather than narrow rules." *Curtiss–Wright*, 687 F.2d at 174. The person allocating insufficient settlement funds must do so by weighing the "relative deservedness" of the claims. *Id.* at 175.

 The "just and equitable" standards govern the Arbitrator's allocation of the Trust assets. The Arbitrator was required to weigh the relative deservedness of the claims based on broad equitable principles. *Curtiss–Wright*, 687 F.2d at 174–75. By agreement of the parties, the allocation is subject to review for abuse of discretion. To vacate or modify the allocation, the Court must find that no reasonable person could agree with it. The Court will resolve any reasonable doubts in favor of enforcing the Award. *Arch of Illinois*, 85 F.3d at 1292.

The Federal Class argues that no court has ever awarded damages for fraud under federal securities law to a holder of securities, as opposed to a seller or buyer. Thus, it asserts that any award to the Holder Class is an error of law. However, even if the Federal Class' statement of federal securities law is accurate, it is irrelevant. The Arbitrator did not allocate 42% of the Trust Assets to the Holder Class based on federal securities law; he made the allocation based on his evaluation of state and common law claims for breach of fiduciary duty. *See supra* pp. 499–500.

 The principle that directors and officers of a corporation owe a fiduciary duty to the corporation's stockholders is so basic that it requires no citation of

authority. *Borak v. J.I. Case Co.*, 317 F.2d 838, 842 (7th Cir.1963). Directors and officers owe a fiduciary duty not to use their positions of trust for their own personal advantage at the expense of the stockholders. *Id.* Such a breach gives rise to a cause of action against the corporation and its officers and directors by the shareholders in their own right. *Id.*

All parties to the Arbitration accept as undisputed fact that Brincat and Doyle, among others, issued false statements about Mercury's earnings to inflate their bonuses and profit from trading Mercury stock. This behavior certainly falls into the category of using a position of trust for personal advantage. Mercury included these false statements in its annual reports and shareholder letters mailed to the members of the Holder Class. The Holder Class presented expert testimony to the Arbitrator that it suffered losses in the range of $867 million to $1.36 billion under lost profits and benefit of the bargain theories. A reasonable person could thus conclude that Mercury's officers gained their advantages of bonuses and stock profits at the expense of Mercury stockholders.

The corporate law of the state of incorporation controls the fiduciary duties of its officers and directors. *Treco, Inc. v. Land of Lincoln Savings and Loan*, 749 F.2d 374, 377 (7th Cir.1984) (applying the Illinois business judgment rule to individual shareholders' suit against a corporation and its officers and directors for breach of fiduciary duty). Mercury is incorporated in Delaware. Under Delaware law, officers and directors owe shareholders constant duties of good faith, due care, and loyalty. *Malone v. Brincat*, 722 A.2d 5, 10, (Del.1998). "It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty." *Id.* When officers or directors deliberately lie to the shareholders about the corporation's business, they have breached their fiduciary duty, whether they request the shareholders to act or not. *Id.* at 14. That breach may give rise to a claim for equitable relief. *Id.*

*Malone* was brought by a group of Mercury shareholders seeking class certification on a claim against Mercury's directors for breach of fiduciary duty. The facts alleged are the same as those accepted by the parties in this case; *Malone* arises out of the same incidents. The Supreme Court of Delaware stated that if the allegations alleged in the complaint were true, the breach of fiduciary duty was "egregious." *Id.* at 8, 14.

That Brincat, Doyle, and others manipulated Mercury's financial statements and records is undisputed by the parties to the Arbitration. Thus, under Delaware law, the breach of fiduciary duty created by their dishonesty was egregious.

In the light of *Malone* and other cases allowing individual shareholders to sue on their own behalf for breach of fiduciary, *see, e.g., Borak,* 317 F.2d 838 (holding that breach of fiduciary duty gives rise to a shareholder's individual cause of action); *see also Mann v. Kemper,* 247 Ill.App.3d 966, 977–980, 618 N.E.2d 317, 325–327, 187 Ill.Dec. 726, 734–736 (1992) (holding that an individual shareholder has standing to sue the corporation and directors for breach of fiduciary duty, even though his injury is not unique to him), the Court must conclude that a reasonable person could agree with the Arbitrator's Award. Reasonable people have indicated that an officer's misstatements about the corporation's finances are egregious breaches of fiduciary duty. *Malone,* 722 A.2d at 8, 14. Even counsel for the Federal Class seems to agree; in arguments before the Arbitrator, he stated that the Holder Class:

> got a lot of deception during the class period. They were lulled into holding their shares. They didn't sell them; and therefore, they suffered these big damages. And they did because of a breach of fiduciary duty under Delaware law. This is no question that that has—

if I were making an argument to a juror, or I were a juror, I'd say, wow, that's a telling and compelling kind of argument just on a fairness basis.

(Tr. p. 129). Since the Arbitrator's task was to allocate the Trust's assets on a relative deservedness, *see supra*, p. 16, or fairness, basis, and that is precisely what he did, the Court concludes that he did not abuse his discretion, but exercised it equitably.[3]

The Arbitrator also offered a reasonable explanation of how he arrived at all of his allocation percentages. He noted that no claimant could hope to receive more than pennies on the dollar (Award p. 9). He evaluated expert testimony presented by the claimants and created a "reasonable estimate which could then be compared against similar estimates of the values of the claims of competing claims." (Arbitrator's Brief in Response to the Notices of Appeal p.13). Such a procedure is fair and equitable and within the scope of the parties' agreement. It specifically weighs the relative deservedness of the Class 7B claims against each other. This is what the Arbitrator was bound by law and the agreement of the parties to do.

## CONCLUSION

For the foregoing reasons, the Award is affirmed.

---

**3.** Due to the way the plan was crafted, the parties, in effect, asked the Arbitrator to render a Binding Mediation award rather than a factual finding-based award. In Binding Mediation, the neutral determines a "fair settlement award." *See* John W. Cooley, The Mediator's Handbook 19 (National Institute for Trial Advocacy 2000).